UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA; <br> DEPARTMENT OF HOMELAND <br> SECURITY; <br> U.S. CUSTOMS AND BORDER <br> PROTECTION; <br> KRISTI NOEM, Secretary, <br> U.S. Department of Homeland Security; <br> PETE R. FLORES, Acting Commissioner, <br> U.S. Customs and Border Protection, <br><br> Defendants, <br><br> and <br><br> ALUMINUM EXTRUDERS COUNCIL; <br> UNITED STEEL, PAPER AND <br> FORESTRY, RUBBER, <br> MANUFACTURING, ENERGY, ALLIED <br> INDUSTRIAL AND SERVICE WORKERS <br> INTERNATIONAL UNION, <br><br> Defendant-Intervenors. | Court No. 24-00264 |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

CHRISTOPHER BERRIDGE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
June 9, 2025                    Telephone: (202) 598-7392

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.1 ............................................................................ 2

   I.  Administrative Determination Under Review ................................................................ 2

   II. Issues Presented for Review ........................................................................................ 2

BACKGROUND ............................................................................................................... 2

   I.  Statutory and Regulatory Framework ......................................................................... 2

   II. CBP's Investigations of Forced Labor in Imported Goods.......................................... 5

   III. The Kingtom Forced Labor Investigation ................................................................... 7

      A.  The Enforce and Protect Act Site Visit ................................................................ 7

      B.  Subsequent Forced Labor Investigation ............................................................... 9

      C.  CBP Issues the *Finding*............................................................................................ 12

SUMMARY OF THE ARGUMENT ................................................................................ 15

ARGUMENT ...................................................................................................................... 15

   I.  Standard of Review...................................................................................................... 15

   II. CBP's Investigation and Analysis of the Evidence Using the ILO Indicators
      is Consistent With Both 19 U.S.C. § 1307 and the Implementing of Regulations......... 18

   III. CBP's Finding Is Not Arbitrary Nor Capricious and
       Is Supported by Substantial Evidence........................................................................ 21

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Am. Silicon Techs. v. United States*,
   261 F.3d 1371 (Fed. Cir. 2001) ................................................................. 17

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ................................................................................... 16

*Camp v. Pitts*,
   411 U.S. 138 (1973) ................................................................................... 16

*Concert Inv., LLC v. Small Bus. Admin.*,
   616 F. Supp. 3d 25 (D.D.C. 2022) ............................................................ 17

*Consolidated Bearings Co. v. United States*,
   412 F.3d 1266 (Fed. Cir. 2005) ................................................................. 16

*Consolidated Fibers, Inc., et al. v. United States*,
   535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ....................................... 16, 24

*Consolo v. Fed. Maritime Comm'n*,
   383 U.S. 607 (1966) ................................................................................... 17

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................... 17

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................ 17

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................................. 17

*Islamic Am. Relief Agency (IARA-USA) v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ................................................................... 15

*John Roe I v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) ......................................... 19, 22, 23

*Mazzari v. Rogan*,
   323 F.3d 1000 (Fed. Cir. 2003) ................................................................. 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................... 16

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013) ................................................................... 16

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018)..................................................................................16

*Tri Union Frozen Products, Inc. v. U.S.*,
227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017)..............................................19

*Velez v. Sanchez*,
693 F.3d 308 (2d Cir. 2012) ........................................................................19


**Statutes**

5 U.S.C. § 706.........................................................................................................15

5 U.S.C. § 706(2) ...........................................................................................15, 17

6 U.S.C. § 557...........................................................................................................3

19 U.S.C. § 1307 ............................................................................................*passim*

28 U.S.C. § 1581(i)................................................................................................15

28 U.S.C. § 2640(e)...............................................................................................15


**Regulations**

19 C.F.R. § 12.42 ...........................................................................................*passim*

19 C.F.R. § 12.42(a) ......................................................................................3, 7, 9

19 C.F.R. § 12.42(b)........................................................................................4, 10

19 C.F.R. § 12.42(d) .................................................................................3, 4, 18

19 C.F.R. § 12.42(e).......................................................................................4, 5, 7

19 C.F.R. § 12.42(f).......................................................................................5, 7, 14

19 C.F.R. § 12.42(g).........................................................................................5, 14

19 C.F.R. § 12.45 .....................................................................................................3


**Rules**

USCIT Rule 56.1..................................................................................................1, 2

**Administrative Determinations**

*Notice of Finding That Aluminum Extrusions and Profile Products and Derivatives Produced or Manufactured Wholly or in Part by Kingtom Aluminio S.R.L. With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be, Imported Into the United States*
89 Fed. Reg. 96,265 (December 4, 2024).....................................................................*passim*

**Other Authorities**

ILO Indicators of Forced Labour
International Labour Organization, United Nations,
https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---
declaration/documents/publication/wcms_203832.pdf (last visited on June 9, 2025) ..... *passim*

International Labour Organization, United Nations,
https://www.ilo.org/global/about-the-ilo/lang--en/index.htm
(last visited on June 9, 2025).................................................................................................. 6

Forced Labour Convention, 1930 (No. 29)
International Labour Organization, United Nations.................................................. 6, 18, 20

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L., | |
| Plaintiff, | |
| v. | Court No. 24-00264 |
| UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; KRISTI NOEM, Secretary, U.S. Department of Homeland Security; PETE R. FLORES, Acting Commissioner, U.S. Customs and Border Protection, | |
| Defendants, | |
| and | |
| ALUMINUM EXTRUDERS COUNCIL; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, | |
| Defendant-Intervenors. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Defendants, the United States *et al.* (the Government), pursuant to Rule 56.1 of the

United States Court of International Trade (USCIT), respectfully submit this response in

opposition to plaintiff Kingtom Aluminio S.R.L.'s (Kingtom) motion for judgment on the agency

record.  ECF No. 45.  Kingtom's motion should be denied and the Court should enter judgment

in the Government's favor because the record demonstrates that U.S. Customs and Border Protection's (CBP) finding that aluminum extrusions and profile products and derivatives were produced, wholly or in part, by Kingtom using forced labor was neither arbitrary nor capricious, and was further supported by substantial evidence.

## STATEMENT PURSUANT TO RULE 56.1

### I.    Administrative Determination Under Review

Kingtom challenges CBP's finding that Kingtom was importing, or likely to import, into the United States aluminum extrusions and profile products and derivatives, that were made, in whole or in part, with forced labor in violation of 19 U.S.C. § 1307.  *See Notice of Finding That Aluminum Extrusions and Profile Products and Derivatives Produced or Manufactured Wholly or in Part by Kingtom Aluminio S.R.L. With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be, Imported Into the United States*, 89 Fed. Reg. 96,265 (December 4, 2024) (the *Finding*).

### II.    Issues Presented for Review

1. Whether CBP's process for issuing the *Finding* that Kingtom was importing or likely to import goods made with forced labor was consistent with 19 U.S.C. § 1307.

2. Whether CBP's *Finding* that Kingtom's aluminum extrusions and profile products and derivates were made in whole or in part with forced labor was arbitrary or capricious and supported by substantial record evidence.

## BACKGROUND

### I.    Statutory and Regulatory Framework

The United States has long prohibited the importation of goods made with forced labor. Section 307 of the Tariff Act of 1930, codified at 19 U.S.C. § 1307, states in relevant part that:

> All goods . . . produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury[1] is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.
>
> "Forced labor", as herein used, shall mean all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily.

Congress barred the entry and importation of goods made with forced labor, and gave CBP discretion about how to enforce that prohibition. As directed by Congress, the Secretary of the Treasury and CBP promulgated implementing regulations, 19 C.F.R. §§ 12.42-12.45, to carry out the statute's objectives.

These regulations allow CBP to self-initiate an investigation into goods imported, or likely to be imported, into the United States that are being produced, wholly or in part, with forced labor. *See* 19 C.F.R. § 12.42(a), (d). If in the course of their duties CBP personnel "ha{ve} reason to believe" that a class of goods made with forced labor is being or is likely to be imported into the United States, CBP officials are required to communicate that belief to the Commissioner of CBP. *Id.* Similarly, the regulations permit "any person outside CBP" to communicate to the Commissioner of CBP his/her belief that goods produced with forced labor in

---

[1] Pursuant to the Homeland Security Act of 2003, the functions and authorities of the U.S. Customs Service were transferred to the Department of Homeland Security. Although the term "Secretary" in Title 19 originally referred to the Secretary of the Treasury, when Congress created DHS and transferred organizational units to DHS, Congress provided that, "{w}ith respect to any function transferred by or under this chapter … reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred." 6 U.S.C. § 557.

a foreign country are being, or are likely to be, imported into the United States.  *See* 19 C.F.R. § 12.42(b).  Both internal and external communications about goods believed to be made with forced labor should contain "(1) {a} full statement of the reasons for the belief; (2) {a} detailed description or sample of the merchandise; and (3) {a}ll pertinent facts obtainable as to the production of the merchandise abroad."  *Id*.  Upon receipt of the communication, the Commissioner of CBP[2] "will cause such investigation to be made as appears to be warranted by the circumstances of the case and the Commissioner or his designated representative will consider any representations offered by foreign interests, importers, domestic producers, or other interested persons." 19 C.F.R. § 12.42(d).  Both the statute and the regulations grant discretion to CBP to investigate the allegations, including how the investigations are conducted.

"If the Commissioner of CBP finds at any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported . . . ," CBP has the authority to issue withhold release orders (WROs) to detain goods subject to the WRO.  19 C.F.R. § 12.42(e).  CBP is authorized to act "at any time" on information available to CBP—whether through a CBP- initiated investigation (*e.g.*, subsection (a)) or an allegation made by any person outside CBP (subsection (b))—to issue a WRO to detain goods suspected of being made, wholly or in part, with forced labor, provided the information available to CBP warrants such an action.  *Id*.

In addition, if CBP determines, based on its investigation, that the goods were made with

---

[2] The Commissioner delegated his authority to allow the Executive Assistant Commissioner, Office of Trade, to take action on importations of goods reasonably suspected of being mined, manufactured or produced, in whole or in part, in violation of section 307 of the Tariff Act of 1930 and determine the admissibility of merchandise pursuant to the regulations promulgated pursuant to section 307, 19 C.F.R. §§ 12.42-12.45.  Delegation Order No. 19-001, Sept. 11, 2019.

forced labor, and are being imported or are likely to be imported to the United States, CBP "will publish a finding to that effect in a weekly issue of the Customs Bulletin and in the Federal Register." 19 C.F.R. § 12.42(f). Any class of goods specified in the finding imported directly or indirectly from the locality identified in the finding that have not been released from CBP custody prior to the date of publication of the finding in the Federal Register shall be treated as an importation prohibited by section 307 unless the importer "establishes by satisfactory evidence" that the merchandise was not made with forced labor. 19 C.F.R. § 12.42(g).

Neither the regulations nor the statute require CBP to first issue a WRO before issuing a finding. The regulations permit CBP to issue a WRO and then issue a finding on the same class of goods if and when CBP determines the merchandise is being made with forced labor and is being imported or are likely to be imported to the United States. 19 C.F.R. §§ 12.42(e), (f). However, CBP does not need to first issue a WRO as an intermediate step if CBP's investigation reveals sufficient evidence to issue a finding.

## II.    CBP's Investigations of Forced Labor in Imported Goods

The Forced Labor Division (FLD), which falls under the Trade Remedy Law Enforcement Directorate (TRLED) of the CBP Office of Trade, was established in 2018 to, in part, enhance enforcement of section 307 by, among other things, investigating alleged violations of the forced labor import prohibition imposed by 19 U.S.C. § 1307. In investigating imports potentially made with forced labor, CBP may use all investigatory tools at its disposal, including but not limited to the use of law enforcement sensitive information collected in the course of customs enforcement investigations.

CBP uses the International Labour Organization's (ILO) indicators of forced labor as guidance for determining the existence of forced labor when evaluating an allegation and

evidence obtained during an investigation.[3]  These indicators were derived from the ILO's extensive experience with forced labor.  The ILO has eleven such indicators to assist in identifying and investigating forced labor: abuse of vulnerability; deception; restriction of movement; isolation; physical and sexual violence; intimidation and threats; retention of identity documents; withholding of wages; debt bondage; abusive working and living conditions; and excessive overtime.[4]  These indicators have been developed based on the definition of forced labor specified in the ILO Forced Labour Convention, 1930 (No. 29) which also appears in section 307: "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."

Because the ILO's definition of forced labor is consistent with that of Congress, the ILO indicators serve as useful means in evaluating evidence to determine the presence of forced labor. *See* 19 U.S.C. § 1307.  Indeed, the ILO's stated goal for promulgating the indicators is to "help 'front-line' criminal law enforcement officials … identify persons who are possibly trapped in a forced labour situation, and who may require urgent assistance."  Kingtom Br. at Attachment 1. The ILO describes the indicators as "the most common signs or 'clues' that point to the possible existence of a forced labour case."  *Id.*  Accordingly, when assessing the evidence gathered in its investigation, CBP looks to see whether these indicators of forced labor are present to help inform any potential law enforcement action like issuing a WRO or a finding.  The ultimate discretion to

---

[3] The ILO is a tripartite agency of the United Nations which "brings together governments, employers and workers of 187 Member States to set labour standards" and develop policies, among other things.  https://www.ilo.org/global/about-the-ilo/lang--en/index.htm (last visited on June 9, 2025).

[4] The ILO indicators of forced labor are found at: https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf (last visited on June 9, 2025) (also attached to Kingtom's brief as Attachment 1).

determine whether evidence meets the threshold for issuing either a WRO or a finding, however, rests solely with CBP. 19 C.F.R. §§ 12.42(e), (f).

### III.    The Kingtom Forced Labor Investigation

As set forth in the regulations and discussed above, there are two ways that CBP accepts information that can form a basis for a forced labor investigation: an internal referral from CBP personnel, or an allegation from outside of CBP. 19 C.F.R. §§ 12.42(a), (b). Kingtom's forced labor investigation was ███████████████████████████████████████ ████████████████████████. C.R.[5] CBP 000039. FLD's review of the referrals and its subsequent investigation demonstrated that CBP had sufficient information to support a finding that Kingtom's aluminum extrusions and profile products and derivatives were being manufactured, in whole or in part, using forced labor at Kingtom's facilities in the Dominican Republic and were being imported into the United States. P.R. CBP 004308.

### A.    The Enforce and Protect Act Site Visit

From August 30 to September 2, 2021, CBP conducted an onsite verification of Kingtom's facilities in the Dominican Republic as part of Enforce and Protect Act (EAPA) investigation No. 7550. P.R. CBP 000096. The purpose of the EAPA verification was to gather information to assist CBP's TRLED in determining whether Kingtom was engaging in evasion of antidumping and countervailing duty orders on aluminum extrusions from China through transshipment. *Id.* During the site visit, CBP personnel and U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) personnel made observations relevant to the EAPA inquiry, including but not limited to, financial statements, payroll records, and

---

[5] "C.R." indicates a citation to the confidential version of the administrative record found at ECF No. 34. "P.R." indicates a citation to the public version of the administrative record found at ECF No. 33.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

production capabilities and capacity to produce aluminum extrusions at Kingtom's facilities. P.R. CBP 000096 - CBP 000127.

While conducting the site visit, CBP and HSI personnel documented observations of potential forced labor conditions at Kingtom's facilities; ███████████████████████ ███████████████████████. C.R. CBP 000067 - CBP 000070.  For example, ██████████████████ ███████████████████████ ███████████████████████ ███████████████████████. C.R. CBP 000067 - CBP 000069. ██████████████████████. C.R. CBP 000069 - CBP 000070.  CBP and HSI personnel reported being contacted "by over 50" Dominican or Haitian workers who claimed that they were being mistreated by Kingtom.  P.R. CBP 000111.  All of the workers "expressed fear of speaking {to CBP/HSI} in front of the Kingtom officials for fear of retribution{.}"  *Id.*  CBP and HSI personnel witnessed Kingtom staff act as "minder{s}" whenever Dominican or Haitian workers would attempt to speak with members of the verification team, which the team members perceived as "sending a message of intimidation" to those employees.  *Id.*  Indeed, at some point before the end of the site visit, a group of local employees reported that they were fired for speaking with CBP during the site visit.  P.R. CBP 000114.

In addition to the reports from the employees, CBP and HSI personnel documented a "penalties board" that listed several reasons why workers would have their pay "docked" for violating Kingtom's rules.  P.R. CBP 000110.  The list of activities for which employees could be penalized included listening to music during work or taking too long to use the bathroom.  *Id.*

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

The site verification team observed a payment envelope showing deducted wages for these violations.  P.R. CBP 000132.  One worker reported to the team that if workers missed a day of work, they would have to pay more in fines than they could earn by working that day.   P.R. CBP 000111.  The site verification team also documented some discrepancies between the procedures by which Kingtom paid its employees and the manner in which employees were paid when the verification team was on site.   P.R. CBP 000114.

According to the site verification team, the site visit concluded with a group of just-terminated Kingtom workers informing the site verification team that the workers were told by Kingtom management/supervision "not to speak with CBP officials or risk retaliation."  P.R. CBP 000114.  As the group of workers spoke to the site verification team, members of the team observed the sudden appearance of a guard armed with a long gun away from his guard post and accompanied by a Kingtom supervisor.  CBP 000114.  After observing what the team considered personal safety concerns, the site verification team decided to conclude the on-site verification process.  P.R. CBP 000114 - CBP 000115.

B.  <u>Subsequent Forced Labor Investigation</u>

Following the site verification visit,



. C.R. CBP 000067 - CBP 000070; C.R. CBP 000096 - CBP 000132.

. C.R. CBP 000072 - CBP 000084.

On March 3, 2022, defendant-intervenors, Aluminum Extruders Council (AEC) and the

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

United Steel Workers (USW), submitted an allegation of forced labor against Kingtom pursuant to 19 C.F.R. § 12.42(b) highlighting many of concerns documented by the EAPA site verification team in the verification report.  P.R. CBP 000155 - CBP 000166.

In addition to the information contained in the referrals, ███████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████.  C.R. CBP 000041.  ███████████████████
████████████████████████████████████████████████
███████████████████████████.  *Id.*  ████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████.  C.R. CBP 000056 - CBP 000058.  FLD noted that ██████████
████████████████████████████████████████████████
███████████████████."  C.R. CBP 000057.   FLD discovered that the Dominican government again forced Kingtom to suspend its activities in July 2024 for unsafe working conditions, excessive overtime, and issues with wages, suggesting that Kingtom did not remediate forced labor issues at its facility.  P.R. CBP 004275 - CBP 004277; P.R. CBP 004283 - CBP 004285.

████████████████████████████████████████████
████████████████████████████.  C.R. CBP 000047.  For instance, ████████
████████████████████████████████████████████████
████████████████.  C.R. CBP 000053 - CBP 000055.  FLD found that ████████████
████████████████████████████████████████████████

███████████████████████████████████████████████

███████. *Id.*  During the COVID-19 pandemic, ███████████████████████

████████████████████████████████████████████. C.R.

CBP 000053. ██████████████████████████████████████

████████████████████████████████. *Id.* ████████████████

████████████████████████████████████████████. *Id.*

Apart from the ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████. C.R. CBP 000047 - CBP 000048.  Kingtom ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████. *Id.*

█████████████████████████████████████████████

████████████████████████████████████████. *Id.* ███████████████

█████████████████████████████████████████████. *Id.*  In

addition, ██████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████. *Id.*

Although ████████████████████████████████████████████

████████████████████████████████. C.R. CBP 000048.  If █████████████

████████████████████████████████████. C.R. CBP 000053. ████████████

████████████████████████████████████████████████. C.R. CBP

000052.  In addition, there were ████████████████████████████████. *Id.*  Kingtom

██████████████████████████████████████████████████

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

███████████████████████████████████████████. C.R. CBP 000052 - CBP 000053.

As a result of the ████████████████████████████████████████

███████████████████████████. C.R. CBP 000055.

Further, ████████████████████████████████████████████

███████████████████████████████████████████████████████.

C.R. CBP 000050 - CBP 000051. ████████████████████████████████

████████████████████████████████████. *Id.* The ███████████

███████████████████████████████████████████████████████

████████████████████████████. C.R. CBP 000050; CBP

000273. As ████████████████████████████████████ C.R. CBP

000054; C.R. CBP 000232; C.R. CBP 001813.

C.   CBP Issues the *Finding*

After reviewing the information, FLD recommended that CBP issue the *Finding* against Kingtom because there was sufficient evidence that forced labor was being used to manufacture Kingtom's aluminum extrusions and related products bound for the United States.  P.R. CBP 004296 - CBP 004297.  FLD noted that the evidence supported the presence of eight of the eleven ILO indicators: abuse of vulnerability, intimidation and threats, deception, withholding of wages, physical and sexual violence, restriction of movement, abusive working and living conditions, and excessive overtime.  *Id.*  While FLD ████████████████████████████

███████████████████████████████████████████████████████

███████████████

        █████████████████████████████████████████

        ██████████████████████████████████████████

        ███████████████████████████████████████████

        ██████████████████████████████████████████



C.R. CBP 000039 - CBP 000040.

On November 13, 2024, former CBP Executive Assistant Commissioner (EAC) AnneMarie Highsmith concurred with FLD's recommendation.  P.R. CBP 004304.  Then-EAC Highsmith signed a memorandum to the field conveying her decision on the issuance of the *Finding* indicating that, effective December 4, 2024, she was using her delegated authority under 19 C.F.R. § 12.42 to direct CBP port personnel to seize aluminum extrusions and profile products produced in the Dominican Republic by Kingtom.  P.R. CBP 004306.

On December 4, 2024, CBP published a notification in the Federal Register of CBP's

*Finding* that "{t}hrough its investigation, CBP has determined that there is sufficient information to support a *Finding* that Kingtom Aluminio S.R.L. is using convict, forced, or indentured labor in a factory in the Dominican Republic to produce or manufacture in whole or in part aluminum extrusions and profile products and derivatives, and that such products are being, or are likely to be, imported into the United States." 89 Fed. Reg. at 96,265. The Federal Register notice stated that:

> Pursuant to 19 U.S.C. 1307 and 19 CFR 12.42(f), it is hereby determined that certain articles described in section II.B. of this Notice, that are produced or manufactured in whole or in part with the use of convict, forced, or indentured labor by Kingtom Aluminio S.R.L., are being, or are likely to be, imported into the United States. Based upon this determination, the port director may seize the covered merchandise for violation of 19 U.S.C. 1307 and commence forfeiture proceedings pursuant to 19 CFR part 162, subpart E, unless the importer establishes by satisfactory evidence that the merchandise was not produced or manufactured in any part with the use of prohibited labor specified in this Finding. 19 CFR 12.42(g).

*Id*.

CBP further notified the public of the following "Articles and Entities Covered by the Finding":

> This Finding covers aluminum extrusions and profile products and derivatives produced or manufactured wholly or in part with aluminum and articles thereof classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7604.21.0010, 7604.29.1010, 7604.29.3060, 7604.29.5050, 7604.29.5090, 7608.20.0090, 7610.90.0080 and any other relevant subheadings under Chapter 76, which are produced or manufactured wholly or in part by Kingtom Aluminio S.R.L.

89 Fed. Reg. at 96,266.

Although an administrative process was available to Kingtom to pursue a modification of the *Finding*, by demonstrating remediation of the forced labor conditions, Kingtom opted instead to file suit challenging CBP's determination. *See* Complaint, ECF No. 1 (December 23, 2024).

14

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

## SUMMARY OF THE ARGUMENT

Kingtom's motion for judgment on the agency record should be denied.  In issuing the *Finding*, CBP did not exceed the statutory authority of section 307, nor was CBP's decision arbitrary, capricious, or unsupported by substantial evidence in the administrative record.  CBP conducted a thorough evaluation of the allegations and developed additional evidence, including ████████████████████████████, that supported a finding that Kingtom's workers were producing goods bound for the United States involuntarily and with menace of penalty for nonperformance.  Using ILO indicators as a guide for evaluating the gathered information, CBP reasonably determined that Kingtom's workers were subjected to forced labor conditions, including but not limited to withheld wages, physical abuse, and excessive, mandatory overtime.  P.R. CBP 004296 - CBP 004297; *see also* Complaint at Attachment 2.  When taken as a whole, the record more than demonstrates that the *Finding* was supported by substantial evidence and was in accordance with CBP's statutory mandate to prevent goods made with forced labor from being imported into the United States.

## ARGUMENT

### I.    Standard of Review

The scope of judicial review for actions commenced under 28 U.S.C. § 1581(i) is found in 28 U.S.C. § 2640(e), which directs the Court to 5 U.S.C. § 706, and is "highly deferential" to the agency, here CBP.  *See Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 733 (2007).  The Court will "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … (C) in excess of statutory … authority … {or} (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title…."  5 U.S.C. § 706(2);

*see also Consolidated Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018); *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003). Pursuant to this standard, the Court: (1) must consider whether the agency's decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between the agency's factual findings and its ultimate action. *Consolidated Fibers, Inc., et al. v. United States*, 32 CIT 24, 535 F. Supp. 2d 1345, 1353-54 (2008). The Court's review in section 1581(i) actions is limited to the administrative record developed before the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

An agency's decision may be arbitrary and capricious where it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency," *id.* at 30, and it must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). That is, the agency's decision should be affirmed as long as there is a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 246 (1962)).

Kingtom asserts that the "substantial evidence" standard is applicable in these circumstances, *i.e.*, that an agency action is arbitrary and capricious when it is not supported by substantial evidence. Kingtom Br. at 12-13. The substantial evidence standard does not apply to

informal adjudications, as they are not "subject to sections 556 and 557" of Title 5 of the U.S. Code, 5 U.S.C. § 706(2)(E).  *Concert Inv., LLC v. Small Bus. Admin.*, 616 F. Supp. 3d 25, 37 n.5 (D.D.C. 2022).  Some courts have suggested, however, that the substantial evidence standard can be viewed "as a component of whether the {decision at issue} is arbitrary and capricious."  *Id.*

Where it applies, the substantial evidence standard means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000).  While the Court examines "the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision," "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Id.*  (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607 620 (1966)).  Moreover, "{e}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent {an agency's} determination from being supported by substantial evidence."  *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)).  And "the Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted) (second alteration in original).  Irrespective of the articulation of the standard, the substantial evidence standard is easily met by the ample record evidence of forced labor in this case.

II.   **CBP's Investigation and Analysis of the Evidence Using the ILO Indicators is Consistent With Both 19 U.S.C. § 1307 and the Implementing Regulations**

Kingtom attempts to detract from CBP's rationale for determining that Kingtom was using forced labor by claiming that CBP impermissibly "substitute{ed}" the ILO indicators for the statutory definition of forced labor. Kingtom Br. at 13. But CBP made no such substitution. Rather, CBP conducted its investigation and analyzed the evidence it gathered to determine if the work being performed was "exacted … under the menace of any penalty for its nonperformance and for which the worker{s did} not offer {themselves} voluntarily." *See* 19 U.S.C. § 1307. That CBP evaluated the evidence considering the ILO indicators to weigh whether Kingtom used forced labor to produce the goods comports with the statute's mandate. While the statute prohibits the importation of forced labor produced goods, it does not impose any discrete duty on the agency as to *how* the agency should determine whether goods are produced with forced labor.

At the outset, section 307 expressly directs CBP to "prescrib{e} such regulations as may be necessary for the enforcement of this provision." *Id.* The terms of section 307 thus afford discretion to CBP to determine whether goods are made with forced labor and if any enforcement action is merited. Congress delegated to CBP the authority to adopt implementing regulations, and those regulations allow CBP to conduct its investigation "as warranted by the circumstances of the case{.}" 19 C.F.R. § 12.42(d). There is nothing in the statute, or CBP's regulations promulgated pursuant to its statutory authority, that prohibit CBP's use of the ILO indicators as a guide in conducting its investigation.

It is particularly reasonable for CBP to consider the ILO indicators because both Congress and the ILO define forced labor using the same language. 19 U.S.C. § 1307; ILO Forced Labour Convention, 1930 (No. 29). Kingtom even admits that the language is "identical{.}" Kingtom Br. at 16, 17. Despite this admission, Kingtom concurrently but

18

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

erroneously argues that CBP's use of the ILO indicators to help guide CBP's forced labor assessment was unlawful. Kingtom Br. at 18. But the ILO indicators are more than simply a logical lens from which to view evidence of forced labor in the context of section 307 — they are the international standard for assessing forced labor which has been relied upon by federal courts when analyzing claims of forced labor. *Velez v. Sanchez*, 693 F.3d 308, 320 (2d Cir. 2012) (discussing the ILO indicators as the starting point for evaluating indicia of forced labor); *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1013-14 (S.D. Ind. 2007) (explaining the ILO indicators and holding "the plaintiffs do not allege any of the listed {ILO} indicators of forced labor—other than those indicating that the persons might lose the same jobs they say they are being forced to perform."). Indeed, this Court has previously found ILO indicators are appropriate for analyzing record evidence of forced labor. *See, e.g.*, *Tri Union Frozen Products, Inc. v. United States*, 227 F. Supp. 3d 1387, 1398 (Ct. Intl. Trade 2017), *determination sustained*, 254 F. Supp. 3d 1290 (Ct. Intl. Trade 2017), *aff'd*, 741 Fed. Appx. 801 (Fed. Cir. 2018) (explaining that when evaluating wage rates in an antidumping duty investigation, the Department of Commerce needed to address reliable ILO indicators of forced labor in the Bangladeshi shrimp industry, as published in a report by an NGO).

Kingtom argues that CBP's ███████████████████████ and listing of the indicators in the press release for the *Finding* was tantamount to impermissibly adding criteria not present in the statute. Kingtom Br. at 18-19. This fundamentally misunderstands the purpose of the ILO indicators. As the ILO explains, the indicators are derived from its expertise in forced labor issues, and are intended to help law enforcement officials identify and understand common signs of forced labor as defined by both the ILO and by Congress, *i.e.*, "work or service which is exacted from any person under the menace of penalty and for which the person has not

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

offered himself voluntarily."  Kingtom Br. at Attachment 1 (citing ILO Forced Labour Convention, 1930 (No. 29)).  The ILO readily explains that each forced labor assessment is different and that, in some cases, one indicator might be enough to show forced labor, while others might require several indicators taken as a whole.  *Id.*  CBP's analysis of and sorting the evidence under various forced labor indicators is a reasonable means by which to sift through evidence to ultimately determine whether the definition of forced labor has been met.  CBP did not, as Kingtom suggests, simply check a box for each indicator and decide that eight out of the eleven indicators were sufficient to generate the *Finding*.  Instead, the ███████████████ █████████████████████████████████████████ served to help CBP decisionmakers understand holistically the work performed at Kingtom's facilities.  C.R. CBP 000039 - CBP 000040; C.R. CBP 000047 - CBP 000056.  Accordingly, CBP did not err or exceed the statutory authority of 19 U.S.C. § 1307 by using the ILO indicators as a guide in determining whether forced labor was occurring at Kingtom's facilities.

Kingtom further claims that CBP failed to consider the statutory requirement for involuntariness of the labor when issuing the *Finding*, and thus CBP's determination is invalid. Kingtom Br. at 14.  But as discussed above, these arguments ignore that CBP analyzed the gathered evidence for both menace of penalty and voluntariness, together as a whole, when ███████ ████████████████████████.  C.R. CBP 000039 - CBP 000040.  Kingtom asserts that, even though the evidence "may (if true)" demonstrate "a colorable claim" for Dominican labor law violations, CBP does not articulate how the evidence shows involuntariness, and therefore CBP exceeded its statutory authority.  Kingtom Br. at 19.  This is an overly constrictive interpretation of forced labor, where Kingtom seemingly demands that CBP use magic words in the record to say that Kingtom's workers were not offering themselves voluntarily.  *See id.*  But the record is replete

with evidence of ██████████████████████. *See, e.g.*, C.R. CBP 000039 - CBP 000040; C.R. CBP 000047; C.R. CBP 000049; C.R. CBP 000053; C.R. CBP 000055.  CBP ultimately determined that the evidence showed that ███████████████████ ███████████████████ thus comporting directly with section 307. C.R. CBP 000039; 19 U.S.C. § 1307.

## III.    CBP's *Finding* Is Not Arbitrary Nor Capricious and is Supported by Substantial Evidence

Kingtom argues that the *Finding* issued by CBP was not supported by substantial evidence and was otherwise arbitrary, capricious, and not in accordance with the law.  Kingtom Br. at 22-30.  As a review of the record makes clear, CBP's determination that Kingtom was using forced labor to manufacture its aluminum extrusions and profile products and derivatives was explained and supported by substantial evidence in the administrative record.   Accordingly, Kingtom cannot meet its high burden of showing that CBP's determination was arbitrary and capricious or unsupported by substantial evidence.  The *Finding* issued by CBP should be sustained.

Kingtom first reiterates its argument that CBP failed to point to record evidence that demonstrated that the workers performed any work involuntarily.  Kingtom Br. at 22.  But as explained above, the record contains abundant evidence that workers regularly worked involuntarily at Kingtom's facilities.  Citing legislative history on section 307, Kingtom contends that forced labor is "equivalent to 'free labor,'" meaning that forced labor is "'slavery, nothing short of slavery.'"  Kingtom Br. at 16 (citing 71 CONG. REC. 4495-96 (1929)).  Under Kingtom's logic, if a worker was told that he would receive pay, worked the required hours or more, and yet did not receive his pay, he would have still worked voluntarily because he initially went to work on his own accord.  This is not the correct standard.

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

Section 307 does not prohibit goods made only with slave labor, nor does the statute require that workers are perpetually in a state of involuntary work; the statute delegates to CBP the ability to determine whether the goods were made involuntarily and with menace of penalty for nonperformance. 19 U.S.C. § 1307. Indeed, the administrative record shows that ███████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████. C.R. CBP 000039 - CBP 000040; C.R. CBP 000047; C.R. CBP 000049; C.R. CBP 000053; C.R. CBP 000055.

To be sure, it strains credulity for anyone to claim they worked voluntarily if, ██████ ██████████████████████████████████████████████████████████████████████████████. C.R. CBP 000286. Likewise, it would not reasonably seen as voluntary if that worker ██████ ████████████████████████████████████████████████. C.R. CBP 000273. And what if the employer ██████████████████████████████████? C.R. CBP 000343. What if the employer ███████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████? C.R. CBP 000283. It would not be unreasonable, at this point, to determine that the worker was not working voluntarily, let alone without menace of penalty for nonperformance. *See* 19 U.S.C. § 1307. Unfortunately for many workers at Kingtom's facilities, these were not hypothetical scenarios, but rather ████████████████████████ ████████████████████████████████████████████. C.R. CBP 000047 - CBP 000056.

To support its arguments that the Dominican and Haitian workers were working entirely voluntarily, Kingtom cites *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1013-18 (S.D. Ind. 2007). Kingtom Br. at 20. In *Bridgestone*, a group of Liberian plantation workers brought

████████████████████████████████████

suit against a company for violations of the Thirteenth Amendment to the United States

Constitution, the Alien Tort Statute, Title 18 of the United States Code, and California law. 492

F. Supp. 2d at 990-991. The *Bridgestone* court found that the principal facts that underpinned the

plaintiffs' complaint were the underpayment of wages and the fear of losing their jobs, and that

those facts, without more, did not constitute forced labor sufficient to overcome a motion to

dismiss. *Id.* at 991.

But *Bridgestone* is not a forced labor case involving importation of goods prohibited by

19 U.S.C. § 1307. Kingtom incorrectly equates the instant case to the *Bridgestone* court's failure

to recognize low wages and poor working conditions as a violation of international law under the

Alien Tort Statute. Moreover, the *Bridgestone* court even remarked that the plaintiffs in that case

failed to allege any ILO indicators of forced labor applied to the workers at issue, implying that

the analysis may have been different had they made such a showing. 492 F. Supp. 2d at 1013-14.

This is in direct contrast to the substantial administrative record in this case, a record that

contains a thorough analysis of forced labor evidence considering the ILO indicators and backed

up by, among other things, direct observations from Government personnel and ████████████

████████████████████. Our record shows that ██████████████████████████

███████████████████████████████████████████████████████████

██████████████████, which supports a finding of forced labor under section 307. C.R. CBP

000047 - CBP 000056.

Kingtom further complains that the *Finding* was "based almost entirely on" ██████████

████████████████████████████. Kingtom Br. at 26. This completely misstates the

record. As FLD ████████████████████████████████████████

███████████████████████████████████████████████████████████

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

██████████████████████████████████████████████████████████████

████████████████████████████. C.R. CBP 000039. That said, Kingtom fails to

articulate why ██████████████████████████████████████████████

███████████████████████████████████████████████████, were

inherently unreliable or would not ████████████ constitute substantial evidence. Ignoring the

EAPA site visit from more than six months prior and the Dominican government's significant

enforcement action, Kingtom argues that the ████████ were uncorroborated and further that

████████████ lacked credibility because they ████████████. Kingtom Br. at 26. Invoking

*Consol. Fibers, Inc. v. United States*, 535 F. Supp.2d 1345, 1356-57 (Ct. Int'l Trade 2008),

Kingtom contends that CBP should have used additional investigating authorities to gather more

information. Kingtom Br. at 26. While this Court in *Consol. Fibers* expressed

disappoint{ment}" with an agency's reliance on unsworn statements of *one* individual, this Court

still found that other record evidence supported the individual statements and the agency's action

was therefore not irrational. 535 F. Supp.2d at 1357. Contrast that with the ████████████

██████████████████████████████████████████████████████████

████████, C.R. CBP 000039, along with the ample record evidence in this case that supports

CBP's finding of forced labor.

Finally, while Kingtom does not challenge that it was manufacturing goods bound for the

United States, Kingtom argues the record evidence was too stale to show that goods exported in

December 2024 and beyond, when the *Finding* took effect, would have been made with forced

labor. Kingtom Br. at 29. Kingtom additionally claims that CBP acted arbitrarily and

capriciously because it failed to consider that Kingtom was allowed to reopen its facilities by the

Dominican government after Kingtom "remediated the labor issues" the Dominican government

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

identified.  *Id.*  This is not correct.  CBP did in fact █████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████.  C.R. CBP 000056 - CBP 000058.

Moreover, the record includes evidence that in late July 2024, the Dominican government once again shut down Kingtom's facilities for several labor law violations relating to wages, overtime, and excessive working hours.  P.R. CBP 004275 - CBP 004285.  CBP was aware of the late July 2024 facilities closure when it concluded in November 2024 that evidence demonstrated that aluminum extrusions and profile products produced by Kingtom were made using forced labor within the purview of 19 U.S.C. § 1307.  *Id.*  Kingtom complains that more recent corroboration was lacking from both CBP's determination and the administrative record. Kingtom Br. at 30.  However, Kingtom failed to acknowledge the July 2024 facilities closure in its brief, which would provide the corroboration Kingtom seeks.

CBP's determination was, therefore, supported by substantial evidence and was not arbitrary, capricious, or otherwise not in accordance with the law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain CBP's determination issuing the *Finding* and deny plaintiff's motion for judgment on the agency record.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

By:   JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Christopher A. Berridge
Christopher A. Berridge
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 598-7392

June 9, 2025

26

**<u>CERTIFICATE OF COMPLIANCE</u>**

I, Christopher A. Berridge, an attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, who is responsible for the Defendants' response in opposition to Plaintiff's motion for judgment on the agency record, dated June 9, 2025, relying upon the word count feature of the word processing program used to prepare the response, certify that this brief complies with the word count limitation under the Court's chambers procedures, and contains 7,588 words.

<u>/s/ Christopher A. Berridge</u>