**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L., <br><br>       Plaintiff, <br><br>   v. <br><br> UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; U.S. CUSTOMS AND BORDER PROTECTION; KRISTI NOEM, Secretary, U.S. Department of Homeland Security; RODNEY S. SCOTT, Commissioner, U.S. Customs and Border Protection, <br><br>       Defendants <br><br>   and <br><br> ALUMINUM EXTRUDERS COUNCIL; UNITED STEEL, PAPER AND FORESTRY, RUBBER, AND MANUFACTURING and SERVICE WORKERS INTERNATIONAL UNION, <br><br>       Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION** <br> Proprietary Information Removed <br> From Page 18 <br><br> No. 24-cv-00264-TMR |

**PLAINTIFF'S COMMENTS OPPOSING REMAND REDETERMINATION**

Brady W. Mills
R. Will Planert
Mary S. Hodgins
Jordan L. Fleischer
Nicholas C. Duffey

Taft Stettinius & Hollister LLP
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
(202) 216-4116

February 23, 2026

*Counsel to Plaintiff*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................................... iii

**I.    INTRODUCTION** .................................................................................................. 2

**II.   STANDARD OF REVIEW** ................................................................................. 4

**III.   ARGUMENT** ....................................................................................................... 5

    **A.   Customs' Substitution Of The ILO Indicators For The Definition of Forced Labor in the *Redetermination* Is an Impermissible Interpretation of the Statutory Definition and Is Arbitrary, Capricious, and Not In Accordance With Law, and Exceeds the Agency's Statutory Authority Or Limitation.** ......................................................................... 5

       1.   The Legal Standard Regarding Forced Labor. ............................................ 6

       2.   Customs May Not Substitute The ILO Indicators for The Statutory Text Defining Forced Labor. ................................................................................ 10

    **B.   Customs' *Redetermination* Is Arbitrary, Capricious And Not In Accordance With Law As The Evidence Does Not Establish that Labor Was Involuntary or Exacted Under The Menace of Penalty for Its Nonperformance.** ................................................. 13

       1.   The Evidence Relied Upon By Customs In The *Redetermination* Does Not Demonstrate That Workers Did Not Offer Themselves Voluntarily ..................................... 14

       2.   The Evidence Relied Upon By Customs In the Redetermination Does Not Demonstrate That Work Was Exacted Through The Menace of Penalty for Nonperformance. ................ 20

    **C.   The *Redetermination* Relies On Stale, One-sided, And Contradicted Information.** . 24

**IV.   CONCLUSION** ................................................................................................ 27

**CERTIFICATE OF COMPLIANCE** ........................................................................ 29

**CERTIFICATE OF SERVICE** .................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adhikari v. Daoud & Partners*,
    697 F. Supp. 2d 674 (S.D. Tex. 2009) ................................................................ 8, 16-17

*Alum. Extruder Fair Trade Committee v. United States*,
    714 F. Supp. 3d 1332 (Ct. Int'l Trade 2024) ............................................................19

*Aragon v. Che Ku*,
    277 F. Supp. 3d 1055 (D. Minn. 2017) ........................................................... *passim*

*Arellano v. Marshalls of MA, Inc.*,
    1:17-cv-00046-TLS-SLC, 2018 WL 1120870 (N.D. Ind. Feb. 2, 2018) ..................... *passim*

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv.*
    *Sys.*, 745 F.2d 677 (D.C. Cir. 1984) (Scalia, J.) ...........................................................4

*Balestra v. United States*,
    803 F.3d 1363 (Fed. Cir. 2015) ...............................................................................10

*B.F. Goodrich Co. v. United States*,
    794 F. Supp. 1148 (Ct. Int'l Trade 1992) .................................................................11

*Bufkin v. Collins*,
    604 U.S. 369, 145 S. Ct. 728 (2025) .........................................................................6

*Burlington Truck Lines v. United States*,
    371 U.S. 156, 83 S. Ct. 239 (1962) .......................................................................4, 15

*Consol. Edison Co. v. Nat'l Labor Relations Board*,
    305 U.S. 197, 59 S. Ct. 206 (1938) ..........................................................................25

*Consol. Fibers, Inc. v. United States*,
    23 C.I.T. 24, 535 F. Supp. 2d 1345 (2008) ..............................................................24

*Corus Staal B.V. v. Dep't of Commerce*,
    395 F.3d 1343 (Fed. Cir. 2005) ........................................................................... 11-12

*Deutch v. Turner Corp.*,
    324 F.3d 692 (9th Cir. 2003) ................................................................................8, 21

*Does I v. The Gap, Inc.*,
    No. CV-01-0031, 2022 WL 1000068 (D. N. Mar. I. May 10, 2002)
    ................................................................................................................... 9, 17-18

*Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*,
    466 U.S. 765, 104 S.Ct. 2105 (1984) ........................................................................6

*Gilead Scis, Inc. v. Lee*,
    778 F.3d 1341 (Fed. Cir. 2015) ...........................................................................10

*Kingtom Aluminio S.R.L. v. United States*,
    No. 24-cv-00264-TMR, Slip Op. 25-125, 2025 WL 2709428 (Sept. 23, 2025) .............. *passim*

*Lackey v. Stinnie*,
    604 U.S. 192, 145 S. Ct. 659 (2025) .....................................................................6

*Laerdal Med. Corp. v. Int'l Trade Comm'n*,
    910 F.3d 1207 (Fed. Cir. 2018) .............................................................................6

*Licea v. Curaco Drydock Co.*,
    584 F. Supp. 2d 1355 (S.D. Fla. 2008) ..................................................................8

*Linyi Chengen Import and Export Co. v. United States*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...............................................4, 24, 26

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369, 144 S.Ct. 2244 (2024) ..............................................................4, 10

*M.M. & P. Maritime Advancement, Training, Education & Safety Program v.*
    *Dep't of Commerce*, 729 F.2d 748 (Fed. Cir. 1984) .............................................11

*Medellin v. Texas*,
    552 U.S. 491, 128 S. Ct. 1346 (2008) ..................................................................12

*Mohammed v. Sidecar Techs. Inc.*,
    No. 16 C 2538, 2016 WL 6647946 (N.D. Ill. Nov. 10, 2016) ................................17

*Morall v. Drug Enforcement Administration*,
    412 F.3d 165 (D.C. Cir. 2005) ............................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983) ............................................................ *passim*

*Nat'l Labor Relations Board Union v. Fed. Lab. Rels. Auth.*,
    834 F.2d 191 (D.C. Cir. 1987) ..............................................................................4

*Pollock v. Williams*,
    322 U.S. 4, 64 S. Ct. 792 (1944) ...........................................................................9

*Velez v. Sanchez*,
    693 F.3d 308 (2d Cir. 2012) ....................................................................... *passim*

**Statutes**

5 U.S.C. § 706 ................................................................................................4

18 U.S.C. § 1584 ...........................................................................................17

18 U.S.C. § 1589 ...........................................................................................17

19 U.S.C. § 1307 ..................................................................................... *passim*

28 U.S.C. § 1350 .............................................................................................7

**Other Authorities**

71 CONG. REC. 4,478 (1929) ..........................................................................7

*Notice of Finding That Aluminum Extrusions and Profile Products and
    Derivatives Produced or Manufactured Wholly or in Part by Kingtom
    Aluminio S.R.L. With the Use of Convict, Forced or Indentured Labor Are
    Being, or Are Likely To Be, Imported Into the United States*, 89 Fed. Reg.
    96,265 (Dep't of Homeland Security Dec. 4, 2024) ...................................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L.,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA;<br>DEPARTMENT OF HOMELAND<br>SECURITY; U.S. CUSTOMS AND<br>BORDER PROTECTION; KRISTI NOEM,<br>Secretary, U.S. Department of Homeland<br>Security; RODNEY S. SCOTT,<br>Commissioner, U.S. Customs and Border<br>Protection,<br><br>    Defendants<br><br>  and<br><br>ALUMINUM EXTRUDERS COUNCIL;<br>UNITED STEEL, PAPER AND FORESTRY,<br>RUBBER, AND MANUFACTURING and<br>SERVICE WORKERS INTERNATIONAL<br>UNION,<br><br>    Defendant-Intervenors. | **NON-CONFIDENTIAL VERSION**<br>Proprietary Information Removed<br>From Page 18<br><br>No. 24-cv-00264-TMR |

<u>**PLAINTIFF'S COMMENTS OPPOSING REMAND REDETERMINATION**</u>

Plaintiff Kingtom Aluminio S.R.L. ("Kingtom") hereby comments in opposition to the

Final Remand Redetermination filed by U.S. Customs and Border Protection ("Customs") on

December 22, 2025. *See* Final Remand Redetermination, *Kingtom Aluminio S.R.L. v. United

States et al.*, No 24-cv-00264-TMR (Dec. 22, 2025), ECF No. 81 ("*Redetermination*"). The

administrative determination at issue is *Notice of Finding That Aluminum Extrusions and Profile

Products and Derivatives Produced or Manufactured Wholly or in Part by Kingtom Aluminio

S.R.L. With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be,

Imported Into the United States*. *See* 89 Fed. Reg. 96,265 (Dec. 4, 2024) ("*Finding*").

## I.    __INTRODUCTION__

This litigation concerns Customs' *Finding* that aluminum extrusion products and derivatives were produced by Kingtom wholly or in part with the use of forced labor, and that such products are being, or likely to be, imported into the United States in violation of 19 U.S.C. § 1307.  *See Finding*, 89 Fed. Reg. at 96,265.  On December 23, 2024, Kingtom commenced this action to contest this *Finding*.  *See* Complaint, *Kingtom Aluminio S.R.L. v. United States et al.*, No 24-cv-00264-TMR (Dec. 23, 2024), ECF No. 5 (citing 5 U.S.C. § 701 *et seq.*).  Kingtom subsequently moved for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.1 and requested that the Court set aside the *Finding*.  *See* Motion for Judgment on the Agency Record and Brief in Support at 31, *Kingtom Aluminio S.R.L. v. United States*, No. 24-cv-00264-TMR (May 5, 2025), ECF No. 46 ("Kingtom's 56.1 Motion" or "Kingtom's 56.1 Brief").  On September 23, 2025, the Court granted Kingtom's 56.1 Motion in part and concluded that the *Finding* was arbitrary and capricious because Customs "failed to 'articulate a satisfactory explanation for its action' based on a 'rational connection between the facts found and the choice made.'"  *Kingtom Aluminio S.R.L. v. United States*, No. 24-cv-00264-TMR, Slip Op. 25-125, 2025 WL 2709428 at *6 (Sept. 23, 2025), ECF No. 61 ("*Kingtom Aluminio*").  The Court vacated the *Finding* and remanded for further consideration.  *Id.* at *5-6 (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983)).

The Court's decision only addressed Kingtom's argument regarding Customs' failure to link the evidence in the public administrative record ("PAR") with the determination in the *Finding* that Kingtom had produced aluminum extrusions with forced labor.  *See Kingtom Aluminio*, 2025 WL 2709428 at *6 ("Customs in the PAR and the *Finding* failed to 'articulate a satisfactory explanation for its action' based on a 'rational connection between the facts found

and the choices made.'"). Kingtom had also argued in its 56.1 Brief that Customs' *Finding* was arbitrary, capricious, otherwise not in accordance with law, or in excess of statutory authority or limitation because (i) Custom's relied on extra-statutory indicators from the International Labor Organization ("ILO") as a substitute for the statutory definition of forced labor in 19 U.S.C. § 1307, and (ii) the evidence relied upon by Customs did not demonstrate forced labor as defined by 19 U.S.C. § 1307. *See* Kingtom's 56.1 Br. at 2. The Court reserved examination of these arguments pending the results of the remand. *See Kingtom Aluminio*, 2025 WL 2709428 at *6.

On December 22, 2025, Customs filed its *Redetermination*. To try and provide the missing connection between the facts found in the PAR and the conclusion made in the *Finding*, Custom's provided a public discussion of the various ILO factors that it claims supports the forced labor determination. However, Customs' conclusion in the *Redetermination* that Kingtom employed forced labor in the production of aluminum extrusions is still unlawful. Customs continues to substitute the ILO factors for the statutory definition of forced labor in 19 U.S.C. § 1307, and the evidence it relies upon does not adequately demonstrate the existence of forced labor because it does not demonstrate that the labor was under the menace of penalty and involuntary. Accordingly, for the reasons discussed herein and in Kingtom's Motion for Judgment on the Agency Record,[1] the Court should find that the *Redetermination* is arbitrary, capricious, or otherwise not in accordance with law and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. Customs' forced labor determination for Kingtom should thus continue to be vacated or reversed in its entirety.

---

[1] Although the *Finding* has been replaced by the *Redetermination*, Kingtom advances many of the same arguments here as it did in its Rule 56.1 briefs and thus incorporates those briefs by reference.

## II.     <u>STANDARD OF REVIEW</u>

Under the Administrative Procedures Act ("APA"), the Court shall hold unlawful and set aside any agency action, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706.  To survive arbitrary and capricious review, the agency must articulate a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency action, finding, or conclusion is arbitrary and capricious where the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Linyi Chengen Import and Export Co. v. United States*, 391 F. Supp. 3d 1283, 1292 (Ct. Int'l Trade 2019) (citing *State Farm*, 463 U.S. at 43).  An agency action is arbitrary and capricious when it is not supported by substantial evidence.  *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984) (Scalia, J.).

When assessing whether an agency's actions, findings, or legal conclusions are in excess of statutory authority or limitation, "the question before this court is solely one of statutory construction."  *Nat'l Labor Relations Board Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 197-98 (D.C. Cir. 1987).  The Supreme Court has made clear that the "best reading" of a statute is "'the reading the court would have reached' if no agency were involved."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 144 S. Ct. 2244, 2266 (2024) (citation omitted).

### III.  ARGUMENT

    **A.**  **Customs' Substitution Of The ILO Indicators For The Definition of Forced Labor in the *Redetermination* Is an Impermissible Interpretation of the Statutory Definition and Is Arbitrary, Capricious, and Not In Accordance With Law, and Exceeds the Agency's Statutory Authority Or Limitation.**

In the *Redetermination*, Customs found that there is sufficient evidence that Kingtom subjected past and current workers to forced labor under 19 U.S.C. § 1307. *Redetermination* at 22. As support, Customs explains that the ILO "sets forth" a definition of forced labor that is "identical" to the definition provided by Section 307 of the Tariff Act of 1930, and that, in turn, "Customs relies on ILO guidance to aid with the interpretation of the statute." *Id.* at 3 (citing 19 U.S.C. § 1307). To determine whether Kingtom employed forced labor, Customs thus "utilized the 11 ILO indicators of forced labor as a guide to analyze the evidence on the record." *Id.* at 8 (citing International Labor Organization, ILO Indicators of Forced Labor (Jan. 1, 2013), on record as ECF No. 47-1 ("*ILO Indicators Booklet*")). Customs concludes that Kingtom "submitted its employees to situations that align with multiple ILO indicators" and that the "existence" of these indicators "suggests" that workers were not rendering labor voluntarily and were performing labor under the menace of penalty. *Id.* at 19.

Customs' entire analysis focuses on the ILO factors and does not link or explain how evidence related to these ILO factors demonstrates the existence of forced labor as statutorily defined. Such a discussion or linkage was required because the ILO indicators are merely "indicators" that could suggest the existence of forced labor; they do not directly address the statutory definition of forced labor that requires that the labor be provided involuntarily and under menace of penalty. *See* 19 U.S.C. § 1307. Nor are the ILO indicators part of U.S. law. Customs' "reliance" on extra-statutory indicators from the ILO instead of the statutory definition of forced labor is inconsistent with rules of statutory interpretation, the legislative history of

Section 307, and case law interpreting the meaning of forced labor.  The *Redetermination* is thus arbitrary, capricious, not in accordance with law, and exceeds statutory authority or limitation.

## 1.  The Legal Standard Regarding Forced Labor.

The task of statutory interpretation "begin{s} with the text."  *See Lackey v. Stinnie*, 604 U.S. 192, 200, 145 S. Ct. 659, 666 (2025).  Pursuant to Section 307, "all goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited."  "Forced labor" in Section 307 "shall mean all work or service which is exacted from any person under the menace of any *penalty for its nonperformance* and for which the worker *does not offer himself voluntarily*."  19 U.S.C. § 1307 (emphasis added).  The mandatory nature of the word "shall" in the statute's definition indicates that Congress did not leave discretion for Customs to expand the statute or substitute the ILO indicators in place of the definition.  *Laerdal Med. Corp. v. Int'l Trade Comm'n*, 910 F.3d 1207, 1212 (Fed. Cir. 2018) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.") (citations omitted); *see also Bufkin v. Collins*, 604 U.S. 369, 379, 145 S. Ct. 728, 737 (2025) ("'Shall' means 'must.'").  As the Supreme Court has explained, "Congress' apparent desire" that certain conditions "'shall' be included" in a definition "must therefore be given effect unless there are clear expressions of legislative intent to the contrary."  *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110 (1984).

The legislative history regarding the amendment to the Tariff Act of 1930 that would become Section 307 emphasizes that, to constitute "forced" labor, work must be truly "involuntary" and "exacted" under "menace of penalty" for its nonperformance in the sense that

the worker has no right to choose whether to work or to leave employment.  Senator John J. Blaine, when introducing the forced labor provision, explained that forced labor "has a definite and specific meaning," and that it "does not include a contract where the person, the employee, the laborer, offers himself voluntarily."  71 Cong. Rec. 4,478, 4490 (1929).  Congress cabined the meaning of limited forced labor to conscript labor and slavery.  71 Cong. Rec. at 4,488 ("Forced labor is, *in effect*, *conscript labor*…") (Sen. Blaine); *id.* at 4491 ("I can readily say for myself that the definition of forced labor and the prohibition of forced labor products as thus defined ought to be acceptable to anyone, because it is really convict labor or slave labor, inasmuch as the worker does not offer himself voluntarily.") (Sen. Blaine); *id.* at 4496 ("The form of labor inhibited by this proposed amendment is slavery, nothing short of slavery.") (Sen. Blaine).  Forced labor is contrasted throughout the Senate debate with "indentured labor," for which the worker binds himself *voluntarily*, and situations where a worker forfeits accumulated wages for breaking contract with his "master" because such was common for apprenticeships at the time and apprenticeships were recognized to not constitute forced labor (despite the apparent "penalty" for "nonperformance").  *Id.* at 4488, 4490-91, 4494, 4496-97.

Federal courts interpreting the term "forced labor" are in accord and have concluded that the term does not have the broad application and wide-ranging implications that Customs has grafted onto it in this case.[2]  In *Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1068 (D. Minn. 2017), the court catalogued cases dealing with what constitutes forced labor.  The court stated that

---

[2] Some of the cases cited herein involved interpretation of the term "forced labor" as a violation of international law for purposes of evaluating claims brought under the Alien Tort Statute (or "ATS"), 28 U.S.C. § 1350. The definition applied in these cases is from the ILO Convention No. 29, which is the definition that is used in 19 U.S.C. § 1307.  *See, e.g., John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1012 (S.D. Ind. 2007) ("*Bridgestone*") (discussing definition of forced labor under ILO Convention No. 29); 71 Cong. Rec. 4488 (stating that language in proposed Section 307 comes from the ILO Convention).

"{w}hen 'applying the {Alien Tort Statute} to forced labor claims, courts in the United States have tended to require more than evidence of terrible working conditions and inadequate wages to state a cognizable violation of customary international law.'" *Id.* at 1068 (quoting *Velez v. Sanchez*, 693 F.3d 308, 321 (2d Cir. 2012)). Cases in which forced labor allegations were accepted "have involved egregious violations of human dignity." *Id.* at 1068. These cases include: situations where workers were subjected to starvation, beatings, physical and mental torture, transport by ship in unventilated cargo holds, forced marches through the tropical sun without water, and threats of execution or death from disease, *Deutch v. Turner Corp.*, 324 F.3d 692, 705 (9ᵗʰ Cir. 2003); international trafficking of individuals, through deceit and coercion, to work against their will, *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 687 (S.D. Tex. 2009); and cases involving plaintiffs held in captivity who suffered severe injuries as a result of their work, were denied medical treatment, and risked imprisonment, death, and the persecution of their families by the Cuban government if they escaped, *Licea v. Curaco Drydock Co.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008). In each of these cases where a colorable allegation of forced labor was found, the labor was involuntary and with penalty for nonperformance in the sense that the workers could not just quit and leave employment. *See, e.g., Aragon*, 277 F. Supp. 3d at 1068 ("In addition to poor working conditions and inadequate compensation, the allegations included physical violence, *periodic physical restraint and confinement*, and threats including but not limited to threats of deportation," and plaintiffs were "*prevented from leaving employment* for many years") (emphasis added).

By contrast, cases where forced labor claims were dismissed involved "poor working conditions" but lacked situations where "physical violence, force, confinement, or constraints" were used as a means to prevent workers "from leaving their employment." *Id.* at 1068; *see also*

*Arellano v. Marshalls of MA, Inc.*, 1:17-cv-00046-TLS-SLC, 2018 WL 1120870 at \*4 (N.D. Ind. Feb. 2, 2018) (finding employer did not "obtain" labor of plaintiff "by means of force, threats of force, physical restraint, or threats of physical restraint" where worker "always had an exit option—to quit her employment"); *Does I v. The Gap, Inc.*, No. CV-01-0031, 2002 WL 1000068 at \*15 (D. N. Mar. I. May 10, 2002) ("The court cannot reasonably infer that the plaintiffs' free will had been overcome and that the plaintiffs had no choice but to work."). For example, in *John Roe I v. Bridgestone Corp.*, the U.S. District Court for the Southern District of Indiana found that claims that plaintiffs were "conscripted" into cultivating rubber for a multinational tire company—an arduous task for which they earned a daily wage equivalent to \$3.19, rarely if ever left the plantation on which they worked and lived, and did not have any days off including paid holidays or sick days—did not meet the definition of forced labor. *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 994, 1013-18 (S.D. Ind. 2007). The *Bridgestone* court found that the definition of forced labor recognizes a "basic distinction between harsh conditions for which an employer is or is not responsible." 492 F. Supp. 2d at 1018. According to the court, the remedy for forced labor is *not* "better wages and working conditions." *Id.* at 1016. Rather, "{t}he remedy for truly forced labor should be termination of the employment and the freedom to go elsewhere." *Id.*; *see also Velez v. Sanchez*, 693 F.3d 308, 321 (2d Cir. 2012) (finding that ILO's definition of forced labor in Convention No. 29 "does not cover 'low wages or poor working conditions'"); *see also Pollock v. Williams*, 322 U.S. 4, 18, 64 S. Ct. 792, 799 (1944) ("{I}n general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers."). Accordingly, forced labor "must involve a 'severe violation of human rights and restriction of human freedom,'" which is not the case here with Kingtom's workers.

2.  Customs May Not Substitute The ILO Indicators for The Statutory Text
Defining Forced Labor.

In the *Redetermination*, Customs acknowledges the definition of forced labor from

Section 307 but states that it "relies on ILO guidance to aid with the interpretation of the statute,"

without explaining how those extra-statutory factors tie to the statutory definition of forced labor.

*Redetermination* at 3.  The *Redetermination* refers to how the ILO interprets its own definition of

forced labor and explains that the ILO uses "11 forced labor indicators as a guide" even though

they are not part of the statute enacted by Congress.  *Id.* at 3.  In its analysis of the record,

Customs solely focuses on whether those extra-statutory ILO indicators are facially present to

determine whether the labor that Kingtom employed "amounted" to forced labor.  *Id.* at 8.  After

discussing each indicator, Customs concludes that it was sufficient for purposes of Section 307

that "Kingtom submitted its employees to situations that align with multiple ILO indicators."  *Id.*

at 19.  Yet Customs' analysis of each of those ILO indicators—individually and collectively—

does not explain how these indicators satisfy the statutory standard in 19 U.S.C. § 1307.  *See id.*

at 9-18.

By relying exclusively on the ILO indicators as the basis for its forced labor finding

without explaining how these indicators meet the statutory definition of forced labor, Customs

has unlawfully substituted them for the statutory definition.  "No matter the context," statutes

must be interpreted "based on the traditional tools of statutory construction, not individual policy

preferences."  *Loper Bright*, 603 U.S. at 403, 144 S. Ct. at 2268.  The tools of statutory

construction "include the statute's text and structure, canons of statutory construction, and

legislative history."  *Balestra v. United States*, 803 F.3d. 1363, 1369 (Fed. Cir. 2015); *see also*

*Gilead Sciences, Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015).  Customs may not rely solely

on the ILO indicators to interpret the statute because they are "factors which Congress has not

10

intended it to consider." *See State Farm*, 463 U.S. at 43, 50-51, 54-55 (1983) (finding that the agency improperly considered the "adverse public reaction" in its decision to rescind the regulatory rule); *see also M.M. & P. Maritime Advancement, Training, Education & Safety Program v. Dep't of Commerce*, 729 F.2d 748, 752 (Fed. Cir. 1984) ("*MATES*") (holding that Customs' denial of duty-free treatment for import of ship-handling simulator, based on its interpretation of the statute that simulator was to be used for "vocational training" rather than for "formal science-oriented education" had "no basis in the law").

For example, in *MATES*, the Federal Circuit concluded that Customs had created an "additional requirement," not found in the applicable statute, that "{an} educational purpose must be a formal science-oriented one" and not a "vocational" one. *Id.* Similarly, in *B.F. Goodrich Co. v. United States*, Customs denied a claim for duty drawback based on its regulation that required the claimant to have "possession" of the imported products while those goods were in the United States. *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148, 1149-50 (Ct. Int'l Trade 1992). The court held that the statutory provisions on drawback only required possession with respect to the *exported* goods, not the imported ones, and therefore "clearly" did not include the possession requirement "that Customs attempt{ed} to graft onto" the statute. *Id.* at 1152. As in *MATES* and *Goodrich* where the Federal Circuit and this court found that Customs had read into a statute a criterion that did not exist, Customs' substitution of the 11 ILO indicators to define "forced labor" in this case is unlawful.

Customs suggests that it is reasonable for it to consider the ILO indicators because the ILO "sets forth a definition of forced labor identical to section 1307." *Redetermination* at 3. However, the ILO definition of forced labor, even if the same or similar, has no bearing on whether Customs may permissibly "rely" on the ILO indicators for "the interpretation of the

statute" without regard to the statutory definition enacted by Congress. *See id.* at 3; *see also Corus Staal B.V. v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir. 2005) (refusing "to overturn Commerce's zeroing practice based on any ruling by the World Trade Organization or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme"); *see also Medellin v. Texas*, 552 U.S. 491, 505, 128 S. Ct. 1346, 1356 (2008) ("{Treaties} are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."). The ILO indicators are just that—"indicators" of forced labor—and do not purport to mandate a forced labor finding if one or several of the indicators are present.

While Customs can refer to the ILO indicators as a tool to aid its analysis it cannot read into the statute the ILO indicators and substitute them for the statutory definition that requires labor be provided involuntarily and exacted under the menace of penalty for nonperformance. Substituting the ILO factors for the statutory definition is particularly unreasonable in this case because the ILO indicators have evolved and changed over time. *See Bridgestone*, 492 F. Supp. 2d at 1013-14 (applying different ILO indicators from those applied in the *Redetermination* because the ILO indicators have changed since the court's decision in *Bridgestone*). The plain language of the statute cannot be supplanted by extra-statutory factors from a human rights organization that revises and updates those factors on an ongoing and evolving basis. Nothing suggests or supports the conclusion that Congress intended for the meaning of forced labor to evolve or change.

In short, the ILO indicators do not, by themselves collectively or individually, focus on whether the work has been exacted under the menace of penalty for nonperformance or whether the worker has offered himself voluntarily. *See Redetermination* at 9-18. The text of Section

12

307, its legislative history, and U.S. case law interpreting an identical definition demonstrate that forced labor only exists if its definition in the statute has been met, which is a standard that Customs failed to apply in this case. Instead, Customs substituted the ILO indicators and determined that Kingtom employed forced labor based merely on the presence of evidence related to six of the ILO indicators without explaining how they show the statutory elements have been met. That determination is arbitrary, capricious and otherwise not in accordance with law, and in excess of statutory authority, limitation or right.

>   **B.**   **Customs'** *Redetermination* **Is Arbitrary, Capricious And Not In Accordance With Law As The Evidence Does Not Establish that Labor Was Involuntary or Exacted Under The Menace of Penalty for Its Nonperformance.**

By focusing on the ILO indicators, and not the statutory definition of forced labor, the record lacks evidence that Kingtom's workers labored involuntarily and that work was exacted under the menace of penalty for its nonperformance as statutorily required. Customs makes no attempt to link the evidence it relies upon for its ILO analysis to the statutory requirements that the labor be involuntary and exacted under the menace of penalty for its nonperformance. Regarding voluntariness, Customs simply makes the conclusory statement that "Kingtom's employees were not rendering their labor voluntarily" because the ILO indicators deception, restriction of movement, and excessive overtime had allegedly been present. *Redetermination* at 19. Regarding menace of penalty for nonperformance, Customs similarly just parrots the ILO factors related to the alleged existence of physical and sexual violence, withholding of wages, and intimidation and threats as demonstrating that the workers were performing labor under menace of penalty, but fails to demonstrate the alleged penalties exacted labor that would otherwise not have been performed. *Id.* at 19. Customs analysis of the record focused merely on

whether these factors were facially present but fails to explain how this evidence demonstrates that the labor was involuntary or exacted under the menace of penalty for nonperformance.

          1.      The Evidence Relied Upon By Customs In The *Redetermination* Does Not Demonstrate That Workers Did Not Offer Themselves Voluntarily

As discussed, Customs points to evidence related to three ILO factors to support its conclusion that Kingtom's workers did not offer themselves voluntarily: excessive overtime, deception and restriction of movement. *Redetermination* at 19. Merriam-Webster defines the term "voluntarily" as: "in a voluntary manner: of one's own free will." In turn, "voluntary" is defined as: "proceeding from the will or from one's own choice or consent."[3] Thus, for a worker to act voluntarily they need to agree to work of their own free will or choice. Conversely, "involuntary" is defined as "done contrary to or without choice." Applying these definitions, if a worker is permitted to quit and leave their employment then they have a choice and can exercise their own free will. Labor provided under these circumstances is voluntary. Customs does not address the meaning of these terms or otherwise explain how the ILO indicators show that Kingtom's workers did not offer themselves voluntarily.

Regarding excessive overtime, Customs found that Kingtom's workers allegedly worked excessive overtime in violation of Dominican Republic labor laws and that, in certain circumstances, they were required to work every day of the week, twelve hours a day without any days off. *Redetermination* at 18-19. But Customs' analysis of excessive overtime is wholly divorced from Section 307 because Customs provides no analysis as to whether the overtime was voluntarily agreed-to as a part of the employment arrangement or if the worker could quit the job if they did not want to work the overtime. To Customs, it is enough that the ILO says that "as a

_____

[3] Definitions attached hereto as Attachment 1 pursuant to the practice comment to Rule 81.

14

rule of thumb, if employees have to work more overtime than is allowed under national law"
whether due to threat or to earn minimum wage, "this amounts to forced labour." *Id.* at 18.
Whether workers had to work lengthy days, even if every day, does not alone demonstrate
involuntariness or forced labor pursuant to Section 307.

     For example, the court in *Bridgestone* dismissed claims that a daily work quota was
forced labor even though the quota was impossible for one adult to meet without the unpaid help
from children. *Bridgestone*, 492 F. Supp. 2d at 1016-17. A more comprehensive analysis of the
circumstances that demonstrates whether work was involuntary is required by the text of Section
307.[4] The *Redetermination's* conclusory explanation is unreasonable and fails to provide a
rational connection between the facts found regarding overtime and choice made that it
constitutes forced labor. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83
S. Ct. 239, 246 (1962); *State Farm*, 463 U.S. at 50, 103 S. Ct. at 2870 ("It is well-established that
an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

     Additionally, where domestic legislation provides remedies for an employer's
mistreatment of employees, the proper avenue for relief is domestic labor law. *Compare Velez*,
693 F.3d at 319-322 *with Velez*, 693 F.3d at 325 (finding claims of 16-year-old Ecuadorian
national, who moved to New York City to work as live-in nanny and was not paid promised
weekly salary, could survive summary judgment under the Fair Labor Standards Act but could
not be considered forced labor). As Customs readily admits in the *Redetermination*, Dominican
Republic law clearly provides such remedies. *See Redetermination* at 18-19 (discussing

---

[4] Even the ILO explains that whether "overtime constitutes a forced labour offence can be
quite complex" depending on the circumstances and limits the "overtime indicator" to merely a
"rule of thumb," thus suggesting that it is not sufficient to find forced labor simply because
excessive overtime exists. *ILO Indicators Booklet* at 26.

excessive overtime as violation of Dominican Republic labor laws).  Moreover, as discussed in

the *Redetermination*, after investigations and temporary shutdowns by the Dominican Republic

Ministry of Labor, Kingtom was permitted by the Dominican government to reopen and operate,

suggesting that issues in violation of domestic law—including issues related to excessive

overtime hours—have in fact been remedied.  *See id.* at 20-21.  Indeed, the record demonstrates

that where violations of domestic labor laws occurred, workers received remedies pursuant to

law.  *See id.* at 21 (noting legal cases whereby workers have obtained remedies against

Kingtom); *Kingtom Aluminio S.R.L. v. Isauc Hiciano Garcia*, 1333 Boletin Judicial 1475 (Corte

de Trabajo de Santo Domingo, 2021), Doc. No. 8.5; *Kingtom Aluminio S.R.L. v. Juan Arturo de

Jesus Hernandez*, 1331 Boletin Judicial 6320, 4375 (Corte de Trabajo de Santo Domingo, 2021),

Doc. No. 8.7.  Unlike domestic labor issues, forced labor, by contrast, "must involve a 'severe

violation of human rights and restriction of human freedom,'" which is not the case here.  *Velez*,

693 F.3d at 321.

Regarding deception, Customs alleges that workers did not allegedly receive the salary or

bonuses to which the workers agreed, vacation, health care, settlements, liquidations or

severances, and received fines that were allegedly not in the employment contract.

*Redetermination* at 11-12.  But Customs fails to demonstrate that the alleged deception deprived

the workers of the ability to work voluntarily.  After all, the workers could quit the job and seek

remedies under Dominican law for labor law violations or civil actions for breach of contract.

This alleged deception did not force them to stay on the job and labor involuntarily.  *Adhikari v.

Daoud & Partners* is instructive.  In that case, the court found it sufficient for plaintiffs to allege

forced labor where they were wrongly informed that they would be working "danger-free" in

Jordan or an American camp but were actually transported to work in an Iraqi combat zone, had

to turn over their passports, and were not permitted to leave until completing the project fifteen months later despite expressing desire to quit. *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 687 (S.D. Tex. 2009). By contrast, Customs does not claim that Kingtom fraudulently induced or coerced workers to work where they otherwise would not or that Kingtom prevented workers from leaving or quitting their jobs. *See generally Redetermination* at 9-18.

Here, the deception that Customs alleges is that workers were not paid wages or benefits that were owed, which is insufficient for a claim of forced labor. *See Mohammed v. Sidecar Techs. Inc.*, No. 16 C 2538, 2016 WL 6647946 at *2-3 (N.D. Ill. Nov. 10, 2016) (finding that claims of physical threats and withheld backpay "do not support a reasonable inference that Sidecar's actions genuinely compelled plaintiff to continue to work in a condition of servitude, with no 'choice' in the matter"); *Arellano*, 2018 WL 1120870 at *5 (finding that plaintiff failed to state a claim for involuntary labor where "the gravamen of Arellano's complaint is that she was simply not paid the wages she was owed").[5] Customs admits that "workers traveled from their homes to work in the Kingtom factory daily," which means that workers had the option to not return to work if they were so deceived that they would not have taken the job or would have refused to work had they not been misled. *Redetermination* at 12. Customs fails to demonstrate that any of the alleged deception deprived workers of their consent to "voluntary" employment or the right to quit for purposes of Section 307.

Regarding restriction of movement, Customs found that Kingtom restricted movement because workers were not allowed to leave the free trade zone during their shift and limited

---

[5] *Arellano*, *Sidecar*, and *The Gap* discuss involuntary servitude pursuant to 18 U.S.C. § 1584 and forced labor pursuant to 18 U.S.C. § 1589. Although not under 19 U.S.C. § 1307, these cases constitute persuasive authority that corroborates that the logic behind Customs' determination is unreasonable.

workers from leaving their posts and going to lunch or the restroom;[6] but none of these alleged actions restricted the movement of workers such that they could not voluntarily quit their job. *Id.* at 13. Customs explains that during work hours workers need to receive a permit to leave the factory or they may be fined or terminated, and notes that security guards temporarily prevent workers from leaving the factory. *Id.* at 13. Even if true, none of this evidence supports the conclusion that employees work involuntarily. *See Arellano*, 2018 WL 1120870 at *4 (finding employer did not "obtain" labor of plaintiff "by means of force, threats of force, physical restraint, or threats of physical restraint" where worker "always had an exit option—to quit her employment"); *see also Does I v. The Gap, Inc.*, No. CV-01-0031, 2022 WL 1000068 (D. N. Mar. I. May 10, 2002) ("The court cannot reasonably infer that the plaintiffs' free will had been overcome and that the plaintiffs had no choice but to work.").

Again, "workers traveled from their homes to work in the Kingtom factory daily," which means that their freedom of movement was not absolutely restricted and workers had the option to not return to work if they felt the working conditions were unsuitable, even if a security guard allegedly bars workers from leaving the factory during work hours. *Redetermination* at 12; *see also* Interview by U.S. Homeland Security Investigations with Worker No. 16 in the Dominican Republic (May 16, 2022), Doc. No. 8.89 at CBP001737 ([

]); Interview by U.S. Homeland Security Investigations with Worker No. 15 in the Dominican Republic (May 16, 2022), at Doc. No. 8.63 at CBP001086 ([

]).[7] Just as in other cases such as *Velez*, where the

---

[6] Customs notes that, during the Covid-19 quarantine, "workers were physically barred from leaving the factory," but Customs does not claim that the quarantine is a restriction of movement in its *Redetermination*. *See Redetermination* at 12-13.

[7] Kingtom notes that bates numbering between the public and confidential records are off by one page number. *See* Allegation Assessment, July 12, 2024, Doc. No. 8 (starting on page

court rejected claims that periods of isolation amounted to forced labor, Kingtom's employees were not deprived of freedom and had the right to quit employment as an "exit option." *See Velez*, 693 F.3d at 322 ("Although Velez was socially isolated to some degree, she was never locked in the Sanchez house and had access to her passport. She was also allowed to leave the house to visit friends, attend social outings, and participate in classes without supervision."); *see Arellano*, 2018 WL 1120870 at *4 ("Arellano apparently always had an exit option—to quit her employment.").

Additionally, Customs verified that Kingtom must have a security guard restrict access to the factory because it is in a foreign trade zone, which requires the Dominican customs authority, and its security guards, to restrict admittance into and out of Kingtom's facility. U.S. Customs and Border Protection, Enforce and Protect Act Case No. 7550: On-Site Verification Report at CBP000098, CBP000106 (Oct. 28, 2021), Doc. No. 8.6 ("Verification Report") (verifying that "Kingtom is located in a walled off compound located in a Foreign Trade Zone with armed guards at the gate to control admittance" and that "DR Customs examines every truck and container arriving into Kingtom's facility"). Strict enforcement of traffic into and out of the foreign trade zone *helps* ensure that Kingtom complies with U.S. customs laws and does not evidence restriction of movement that limits worker freedom. *See Alum. Extruder Fair Trade Committee v. United States*, 714 F. Supp. 3d 1332, 1351-52 (Ct. Int'l Trade 2024) (citing Kingtom's imports and exports to and from the free trade zone as evidence that it was not evading antidumping or countervailing duty orders).

---

number CBP00038 in the confidential record and on page CBP000039 in the public record). Bates citations in this brief are to the bates numbering in the upper right-hand corner of the confidential record documents.

2.    The Evidence Relied Upon By Customs In the Redetermination Does Not Demonstrate That Work Was Exacted Through The <u>Menace of Penalty for Nonperformance</u>.

In addition to needing to demonstrate that workers were laboring involuntarily, Section 307 also limits forced labor to only work "which is exacted from any person under the menace of any penalty for its nonperformance." 19 U.S.C. § 1307. A penalty or threatened penalty alone is insufficient to demonstrate forced labor pursuant to Section 307. Instead, work must be "exacted" through the "menace of penalty" for the "nonperformance" of the work. In the *Redetermination* Customs points to evidence related to three ILO factors to support its conclusion that Kingtom's workers were performing labor under the menace of penalty for nonperformance: physical and sexual violence, withholding of wages, and intimidation and threats. *Redetermination* at 19. However, even if this evidence is credible (which it is not), it does not demonstrate that any of the work by Kingtom's workers was "exacted" under the "menace of penalty for its nonperformance" as required by Section 307.

As explained, claims of forced labor "require more than evidence of terrible working conditions and inadequate wages." *Velez*, 693 F.3d at 321; *Aragon*, 277 F. Supp. 3d at 1068. To constitute the "menace of penalty," physical violence must "compel" the employee to work. *See Velez*, 693 F.3d at 322; *see also Arellano*, 2018 WL 1120870 at *4 (finding employer did not "obtain" labor of plaintiff "by means of force, threats of force, physical restraint, or threats of physical restraint" where worker "always had an exit option—to quit her employment"). In *Velez*, the court found that a physical altercation whereby the employer grabbed the employee and pushed her into a car and confined her to her room until given permission to leave did not constitute menace of penalty because it did not compel her to work. *Velez*, 693 F.3d at 315 and 322. In the same vein, the court in *Aragon* permitted a forced labor claim to proceed over the employer's motion to dismiss because the plaintiff sufficiently alleged that, "by means of"

20

physical violence and threats, the employer "extracted uncompensated labor" and "prevented plaintiffs from leaving their employment for many years." *Aragon*, 277 F. Supp 3d at 1068; *see also Deutch v. Turner Corp.*, 324 F.3d at 705 (finding forced labor where workers were "subjected to serious mistreatment including starvation, beatings, {and} *physical and mental torture*") (emphasis added). Consistent with *Velez* and *Aragon*, the text of Section 307 confines forced labor to situations where "by means of" the menace of a penalty to be imposed if the worker refuses to work (*i.e.*, nonperformance), the employer "exacts" labor from the unwilling. *See* 19 U.S.C. § 1307.

In the *Redetermination*, Customs claims that the indicator "withholding of wages" exists because Kingtom allegedly imposed fines that were deducted from the employee's salary for various reasons such as missing work, leaving workstations, going to the bathroom or forgetting to clock in and out. *Redetermination* at 15-16. Customs also claims that the indicator "physical and sexual violence" exists because of alleged violence between Kingtom employees and management, including a situation where management purportedly hit an employee because they did not understand a request to retrieve a water bottle. *Id.* at 14-15. Customs determined that the indicator "threats and intimidation" exists because workers reported threats of the alleged withheld wages and physical violence, as well as threats of terminating employment. *Id.* at 16. Customs claims that Kingtom "used threats and intimidation to coerce vulnerable workers into accepting unfavorable terms and conditions of employment" and fined or physically abused workers "to coerce workers into working harder" or complying with specific demands or orders. *Id.* at 17. As support, Customs only provides examples of workers being threatened with termination or fines. *Id.* at 18 (noting workers did not complain out of fear of termination and were threatened with termination).

21

Customs fails to explain how Kingtom, through any of the withheld wages, physical or sexual violence, or threats and intimidation, exacts work from workers who are otherwise unwilling to work.  It is not enough to show that certain of Kingtom's managerial employees purportedly have physical altercations with other employees *as long as* the employees are employed and laboring of their own free will.  Customs does not claim that physical violence prevented workers from quitting their job or forced them to work, only that in some anecdotal situations management would tease employees and strike them if they did not understand or failed to follow instruction.  *Id.* at 15.  The same is true for the fines for missing work, leaving workstations, going to the bathroom or forgetting to clock in and out.  *See id.* at 15-16.  None of these reasons demonstrate that fines forced the worker to work for Kingtom where they otherwise would not.  *See Bridgestone*, 492 F. Supp. 2d at 995 (rejecting that workers were employed through the menace of penalty even though the employer deducted from wages fees for healthcare, school, and food, and the workers were "left with virtually nothing at the end of {the} month").  The conduct described in the *Redetermination* is not prohibited by Section 307 because Customs fails to demonstrate that the violence or fines exact work or employment that would not otherwise have been performed.

Other than violence and fines, the only examples that Customs raises are threats and fear of termination.[8]  *Redetermination* at 18.  However, the "expressed fear of losing one's current employment is a clear indicator that the employment is not forced labor."  *Bridgestone*, 492. F. Supp. 2d at 1014; *Arellano*, 2018 WL 1120870 at *4 ("Arellano's allegation that she was 'constructively discharged' by Defendants… seems fundamentally at odds with her claim of

---

[8] Customs also raises the fear of unemployment as an abuse of vulnerability indicator. *Redetermination* at 10-11.

involuntary labor."). Indeed, the court in *Bridgestone* explained that "the phrase 'menace of any penalty' does not refer to the harm a person would suffer if he leaves a job and is unable to earn a living elsewhere." *Bridgestone*, 492 F. Supp. 2d at 1018. The fear or threat of termination in this case demonstrates that the workers are not actually forced to work under the menace of penalty. Rather, it demonstrates that vulnerable workers face dire economic circumstances and are voluntarily willing to accept harsh working conditions to earn a wage. Such a situation does not satisfy the standard required by Section 307.

Lastly, Kingtom notes the *Redetermination* includes an affirmative finding regarding abuse of vulnerability, but Customs makes no attempt to explain whether it relates to voluntariness or menace of penalty for nonperformance. *Compare Redetermination* at 8 with *Redetermination* at 19. In its analysis of the abuse of vulnerability indicator, Customs explains that Kingtom abused Dominican and Haitians workers' fear of unemployment, and treated Haitians better than its Dominican employees. *Id.* at 9-10. Customs claims that Kingtom preferred to hire Haitians because they were "easier to control" due to their undocumented status, and provided food and healthcare to Dominicans but not Haitians. *Id.* at 10. None of the cited evidence demonstrates that either the Dominicans or Haitians were working for Kingtom involuntarily or under the menace of penalty pursuant to Section 307. To the contrary, Customs notes that Dominican and Haitian workers "*accepted* the abusive conditions" due to exploitative poverty, illegal immigration status, language barriers and desperation for employment. *Id.* at 9. Customs thereby admits that the workers are employed voluntarily because they "accept" the conditions of employment, even if abusive. Additionally, desperation for employment due to poverty, language barriers and immigration status is not a penalty that forces employees to work and is thus insufficient to demonstrate that work has been exacted pursuant to Section 307.

Again, as explained in *Bridgestone*: "The phrase 'menace of any penalty' does not refer to the harm a person would suffer if he leaves a job and is unable to earn a living elsewhere." *Bridgestone*, 492 F. Supp. 2d at 1018.

In sum, Customs has not demonstrated in the *Redetermination* that workers would not otherwise work for Kingtom but for the alleged violence, wage deductions, and threats it identified. *See Redetermination* at 13-15. The *Redetermination* has not demonstrated that work was exacted through the menace of penalty for its nonperformance pursuant to Section 307.

### C. The *Redetermination* Relies On Stale, One-sided, And Contradicted Information.

In addition to not being supported by substantial evidence the *Redetermination* is largely based on the attestations of 16 unnamed individuals that purportedly worked for Kingtom and that Customs interviewed between May 16-19, 2022, concerning their experiences prior to May 2022. *Redetermination* at 6. These interviews were conducted secretly by Customs and were not under oath or with the penalty of perjury. *See Consol. Fibers, Inc. v. United States*, 23 C.I.T. 24, 38-39, 535 F. Supp. 2d 1345, 1357, (2008) ("It is disappointing that the Commission, an investigatory agency with subpoena power performing quasi-adjudicatory functions, thought it wise to rely so heavily on the unrecorded statements of one individual, *not under oath*, made during an *ex parte* telephone conversation. Such a choice does seem to test the rationality of the Commission's decision.") (emphasis added). Customs provides no corroborating evidence regarding many of the claims by workers in the interviews despite the interviews being conducted *ex parte*. *See Redetermination* at 5-7 (citing only photographs regarding injuries, hazardous work conditions, and limited payroll or termination documents). Customs was required—but failed—to account for the one-sided nature of these interviews and the resulting lack of credibility they possess. *See Linyi*, 391 F. Supp. 3d at 1292 (noting agency action is

arbitrary where the agency "failed to consider an important aspect of the problem"); *see also*

*Morall v. Drug Enforcement Administration*, 412 F.3d 165, 167 (D.C. Cir. 2005) ("The agency

decision is, in short, stunningly *one-sided in its focus* and, thus, utterly arbitrary and capricious.")

(emphasis added).  Indeed, the Supreme Court has questioned the use of unsworn, unverified

statements in an agency record.  *Consol. Edison Co. v. Nat'l Labor Relations Board*, 305 U.S.

197, 230, 59 S. Ct. 206, 217 (1938) ("Mere uncorroborated hearsay or rumor does not constitute

substantial evidence.").

   Even if credible, those interviews do not have any probative value concerning Kingtom's

labor practices two and a half years later, at the time of the December 2024 *Finding* or the

December 22, 2025 *Redetermination*.  The only evidence that Customs gathered subsequent to

those interviews concerning Kingtom's labor practices was limited to investigations by the

Dominican Ministry of Labor in 2022 and 2024, which provide no evidence that forced labor

was present.  The record contains little to no analysis from June 2022 through March 2023, and

no record documents from May 2023 through March 30, 2024. The recommendation was not

approved until August 2024, and the *Finding* was not published until December 2024.  *See* U.S.

Customs and Border Protection, "Kingtom Aluminio S.R.L. (KT) Finding" (July 18, 2024), Doc.

No. 9 at CBP004263.  The length of time between the worker interviews and *Redetermination*

has deteriorated any certainty that Customs could have had that the labor conditions described in

the interviews are unchanged.

   The purpose of Section 307 is to prevent *goods produced* using forced labor from being

sold in the United States.  To effect this policy goal, the statute provides that "goods, wares,

articles, and merchandise mined, produced or manufactured wholly or in part in any foreign

country by convict labor or/and forced labor" are "not entitled to entry" "and their importation

thereof is hereby prohibited." 19 U.S.C. § 1307. In practice, this grants Customs the authority to consider whether *specific goods* in an entry were produced using forced labor, and to either conclude that they were not and allow them to be imported, or to conclude that they were and seize them or allow their re-export. Customs does not have authority to bar entry of merchandise produced in December 2024 based on evidence of forced labor that may have occurred in May of 2022 or during the Covid-19 pandemic, well before the merchandise at issue here would have been produced. That is, because the statute concerns the goods and not the producer, information about labor practices of the producer at times other than the time of production has limited to no probative value to the question of whether the merchandise was produced using forced labor.

Additionally, the investigations by the Dominican Ministry of Labor support the conclusion that Kingtom did not employ forced labor. The Dominican government investigated Kingtom at the same time as Customs' interviews from May 16-19, 2022, but did not report that it had found any evidence of involuntary labor and permitted Kingtom to reopen. This provides evidence that forced labor had not occurred because companies that are closed by the Ministry of Labor may only reopen once they "comply with the law." *Redetermination* at 20; *see also* Martin Polanco, "Luis Miguel De Camps: Reform of the Code Must Address Pending Issues for Decades" (May 11, 2022), Doc. No. 4 at CBP000020 ("What a company that is closed would have to do, so that it can reopen is comply with the law."). Customs must consider this evidence that runs counter to the agency's explanation. *See Linyi*, 391 F. Supp. 3d at 1292 ("An agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (quoting *State Farm*, 463 U.S. at 43).

Despite the reopening of Kingtom by the Dominican government, Customs concluded that Kingtom had not remediated the forced labor allegedly identified in its 2022 interviews because, according to Customs, the two-week shutdown by the Dominican Ministry was insufficient time to implement meaningful remediation of forced labor practices, and because Kingtom allegedly continues to be the subject of scrutiny by the Ministry given that it was also closed in 2024. *Redetermination* at 20-21. Such an explanation fails to reconcile the inconsistency between *Redetermination* and the clean bill of health from the Dominican Ministry of Labor that must have occurred for Kingtom to reopen.

In sum, Customs unreasonably relied on stale, one-sided, and uncorroborated evidence from two and half years prior to its *Finding* even though no forced labor was discovered in an official inspection by the Dominican government. This further renders the *Redetermination* arbitrary, capricious and otherwise not in accordance with law.

## IV.   <u>CONCLUSION</u>

Plaintiff respectfully requests that this Court (1) hold the *Redetermination* is arbitrary, capricious, or otherwise not in accordance with law, and in excess of statutory authority, limitation or right; (2) hold that the *Redetermination* is unlawful and set it aside; (3) hold that the

*Redetermination* shall have no force or effect; (4) enter judgment for Kingtom; and (5) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
R. Will Planert
Mary S. Hodgins
Jordan L. Fleischer
Nicholas C. Duffey

TAFT STETTINIUS & HOLLISTER LLP
1333 New Hampshire Ave, NW, Suite 800
Washington, D.C. 20036
(202) 216-4116

Dated: February 23, 2026                    *Counsel to Plaintiff*

28

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 8,606 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Brady W. Mills

Dated: February 23, 2026                                          Brady W. Mills

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Rules of the U.S. Court of International Trade and Administrative Order 25-01, I, Brady W. Mills, hereby certify that on February 23, 2026, I served the confidential version of the foregoing submission on the following individuals.  If the recipient agreed to accept service of the foregoing submission by electronic service, such service is being effected through secure electronic means.  If no agreement for electronic service has been reached, the foregoing submission is contemporaneously being served by hardcopy mail.

On behalf of the United States
Monica Perrette Triana
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
New York, NY 10278
Email: monica.p.triana@usdoj.gov

On Behalf of the Aluminum Extruders Council and the United Steel, Paper and Forestry, Rubber, and Manufacturing and Service Workers International Union
Robert Edward DeFrancesco, III
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036
Email: rdefrancesco@wiley.law

/s/ Brady W. Mills
Brady W. Mills

**Attachment 1**





