UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L.,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA;<br>DEPARTMENT OF HOMELAND<br>SECURITY;<br>U.S. CUSTOMS AND BORDER<br>PROTECTION;<br>KRISTI NOEM, Secretary,<br>U.S. Department of Homeland Security;<br>RODNEY SCOTT, Commissioner, U.S.<br>Customs and Border Protection,<br><br>    Defendants,<br><br>    and<br><br>ALUMINUM EXTRUDERS COUNCIL;<br>UNITED STEEL, PAPER AND<br>FORESTRY, RUBBER,<br>MANUFACTURING, ENERGY, ALLIED<br>INDUSTRIAL AND SERVICE WORKERS<br>INTERNATIONAL UNION,<br><br>    Defendant-Intervenors. | Court No. 24-00264<br><br><br><br><br>PUBLIC VERSION |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S COMMENTS ON**
**<u>REMAND REDETERMINATION</u>**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

MONICA P. TRIANA
Senior Trial Counsel
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, NY 10278
(212) 264-9240

Dated: May 1, 2025                    *Attorneys for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................2

BACKGROUND .................................................................................................................3

    I.    Statutory And Regulatory Framework...................................................................3

    II.    CBP's Investigations Of Forced Labor In Imported Goods ...............................4

    III.    CBP's Forced Labor Investigation And Initial Determination .........................6

    IV.    CBP's Forced Labor Investigation And Remand Redetermination..................8

ARGUMENT .....................................................................................................................13

    I.    Standard Of Review.............................................................................................13

    II.    CBP's Investigation, Analysis Of The Evidence, And Issuance Of The Finding Using The ILO Indicators Were Consistent With Both 19 U.S.C. § 1307 And The Implementing Regulations .................................................................................15

        A.    CBP's Analysis Of The Statutory Language And Consideration Of ILO Guidance Was Appropriate..............................................................................16

        B.    Kingtom's Analysis Of The Statutory Language Is Overly Narrow And Incorrect .........................................................................................................20

    III.    CBP's Redetermination Is Neither Arbitrary Nor Capricious And Is Supported By Substantial Evidence.........................................................................................24

        A.    Substantial Evidence Of Menace Of Penalty........................................24

        B.    Substantial Evidence That Labor Was Not Voluntary.........................29

    IV.    The Redetermination Is Supported By Sufficient Evidence ...........................35

CONCLUSION..................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adhikari v. Daoud & Partners*,
   697 F. Supp. 2d 674 (2009) ................................................................................ 22, 23, 24

*Aragon v. Che Ku*,
   277 F. Supp. 3d 1055 (D. Minn. 2017) ........................................................................ 23, 24

*Arellano v. Marshalls of MA, Inc.*,
   2018 WL 1120870 (N.D. Ind. Feb. 2, 2018) ........................................................................ 34

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ................................................................................................ 14

*Camp v. Pitts*,
   411 U.S. 138 (1973) ........................................................................................... 13, 36

*Chevron U.S.A. Inc. v. National Resources Defense Counsel, Inc.*
   467 U.S. 837 (1984) ................................................................................................ 17

*Consolidated Bearings Co. v. United States*,
   412 F.3d 1266 (Fed. Cir. 2005) ............................................................................... 13

*Consolidated Fibers, Inc., et al. v. United States*,
   535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ........................................................ 13, 37

*Consolo v. Fed. Maritime Comm'n*,
   383 U.S. 607 (1966) ................................................................................................ 14

*Deutsch v. Turner Corp.*,
   324 F.3d 692 (9th Cir. 2003) ................................................................................. 23, 24

*Diamond Tools Tech. LLC v. United States*,
   609 F. Supp. 3d 1378 (Ct. Int'l Trade 2022) ........................................................... 14

*Glaxo Operations, UK Limited v. Quigg*,
   894 F.2d 392 (Fed. Cir. 1980) ................................................................................. 16

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................................... 14

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ........................................................................... 14, 38

*Islamic Am. Relief Agency (IARA-USA) v. Gonzales*,
  477 F.3d 728 (2007) .................................................................................................. 13

*John Roe I v. Bridgestone Corp.*,
  492 F. Supp. 2d 988 (S.D. Ind. 2007)................................................................*passim*

*Kingtom Aluminio S.R.L. v. United States*,
  805 F. Supp. 3d 1317 (Ct. Int'l Trade 2025) ...................................................... 2, 8

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................................. 17

*Mazzari v. Rogan*,
  323 F.3d 1000 (Fed. Cir. 2003) ............................................................................... 13

*Mohammed v. Sidecar*,
  2016 WL 6647946 (N.D. Ill. Nov. 10, 2016) ......................................................... 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................... 13, 14, 24

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013)................................................................................. 14

*New York And Presbyterian Hospital v. United States*,
  881 F.3d 877 (Fed. Cir. 2018) ................................................................................. 16

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) .............................................................................................. 13

*United States v. James*,
  478 U.S. 597 (1986) .................................................................................................. 16

*Velez v. Sanchez*,
  693 F.3d 308 (2d Cir. 2012) ...............................................................................*passim*

**Statutes**

5 U.S.C. § 706.................................................................................................................. 13

19 U.S.C. § 1307.......................................................................................................*passim*

28 U.S.C. § 1581.............................................................................................................. 13

28 U.S.C. § 2640.................................................................................................................13

Uyghur Forced Labor Protection Act, P.L. 117-21 (Dec. 23, 2021)……………………………24

**Regulations**

19 C.F.R. § 12.42 ........................................................................................................*passim*

19 C.F.R. § 12.45 ...............................................................................................................3

**Other Authorities**

*Notice of Finding That Aluminum Extrusions and Profile Products and Derivatives Produced or Manufactured Wholly or in Part by Kingtom Aluminio S.R.L. With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be, Imported Into the United States*, 89 Fed. Reg. 96,265 (Dec. 4, 2024) ....................................................................................2, 8

71 CONG. REC. S4,478, 4,490-91 (Oct. 14, 1929) ......................................................21

Forced Labor Enforcement Task Force's (FLETF) *Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China*, Department of Homeland Security (June 17, 2022), *available at* 20-22, https://www.dhs.gov/uflpa-strategy .................................................................................19

ILO, What is Forced Labour?, available at: https://www.ilo.org/topics/forced-labour-modern-slavery-and-trafficking-persons/what-forced-labour (last visited Apr. 30, 2026).......................15

ILO, A Global Alliance Against Forced Labour, 2005 found at: https://www.ilo.org/publications/new-ilo-report-global-alliance-against-forced-labour (last visited Apr. 30, 2026) ....................................................................................................*passim*

The ILO indicators of forced labor available at : https://www.ilo.org/wcmsp5/groups/public/--ed_norm/---declaration/documents/publication/wcms_203832.pdf (last visited on Apr. 29, 2026) ....................................................................................................*passim*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA; <br> DEPARTMENT OF HOMELAND <br> SECURITY; <br> U.S. CUSTOMS AND BORDER <br> PROTECTION; <br> KRISTI NOEM, Secretary, <br> U.S. Department of Homeland Security; <br> PETE R. FLORES, Acting Commissioner, <br> U.S. Customs and Border Protection, <br><br> Defendants, <br><br> and <br><br> ALUMINUM EXTRUDERS COUNCIL; <br> UNITED STEEL, PAPER AND <br> FORESTRY, RUBBER, <br> MANUFACTURING, ENERGY, ALLIED <br> INDUSTRIAL AND SERVICE WORKERS <br> INTERNATIONAL UNION, <br><br> Defendant-Intervenors. | Court No. 24-00264 <br><br> PUBLIC VERSION |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S COMMENTS ON**
**REMAND REDETERMINATION**

Defendants, the United States *et al.* (the Government), respectfully submit this response

to comments filed by plaintiff Kingtom Aluminio S.R.L. (Kingtom).  ECF No. 89.  The

comments and our response concern the Final Remand Redetermination (Redetermination)

issued by U.S. Customs and Border Protection (CBP), ECF No. 81, pursuant to this Court's

opinion and remand order.  *Kingtom Aluminio S.R.L. v. United States*, 805 F. Supp. 3d 1317 (Ct. Int'l Trade 2025).  We respectfully request that the Court sustain the Redetermination because CBP has complied with the Court's remand order and further explained its determination on the public administrative record (PAR).  Moreover, the decision to issue the Finding and the Redetermination are supported by substantial evidence in the record.

## INTRODUCTION

Kingtom challenged CBP's Finding that it was importing, or likely to import, into the United States aluminum extrusions, profile products and derivatives, that were made, in whole or in part, with forced labor in violation of 19 U.S.C. § 1307.  *See Notice of Finding That Aluminum Extrusions and Profile Products and Derivatives Produced or Manufactured Wholly or in Part by Kingtom Aluminio S.R.L. With the Use of Convict, Forced or Indentured Labor Are Being, or Are Likely To Be, Imported Into the United States*, 89 Fed. Reg. 96,265 (Dec. 4, 2024) (the Finding).  In its opinion remanding this matter, the Court concluded that "Customs in the PAR and the *Finding* failed to 'articulate a satisfactory explanation for its action' based on a 'rational connection between the facts found and the choice made.'"  *Kingtom*, 805 F. Supp. 3d at 1325 (citations omitted).  As discussed below, CBP complied with the Court's remand order and publicly explained the connection between the facts found in its investigation and its Redetermination.  ECF No. 81.  Kingtom appears to agree that CBP complied with the Court's order noting that "Customs[] provided a public discussion of the various ILO factors that it claims supports the forced labor determination."  Kingtom Comments at 3.  However, Kingtom reiterates its challenge to CBP's use of the ILO indicators and maintains that the evidence relied upon is insufficient to support the agency's decision.  *Id.*  The Redetermination provides an adequate explanation and is supported by substantial evidence in the record.

**BACKGROUND**

I.     **Statutory And Regulatory Framework**

CBP enforces Section 307 of the Tariff Act of 1930, codified at 19 U.S.C. § 1307, which prohibits the importation into the United States of goods "produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions." Forced labor is defined, by statute, as "all work or service which is exacted from any person under the menace of any penalty for its nonperformance and for which the worker does not offer himself voluntarily." 19 U.S.C. § 1307. If a good that is being or likely to be imported is made wholly or in part with forced labor, that good shall be prohibited from entering into the United States. *Id*.; 19 C.F.R. § 12.42.

The statute itself does not specify how CBP must implement its requirements, but, instead, directs the Secretary of the Treasury to promulgate regulations to carry out the statute's objectives. 19 U.S.C. § 1307; 19 C.F.R. §§ 12.42-12.45. The regulations, therefore, require that CBP investigate allegations of forced labor and allows it the discretion to determine how the investigations are conducted. Pursuant to the regulation, "[i]f the Commissioner of CBP finds at any time that information available reasonably but not conclusively indicates that merchandise within the purview of section 307 is being, or is likely to be, imported . . . ," CBP has the authority to issue withhold release orders (WROs) to detain, and potentially to exclude, goods subject to the WRO. 19 C.F.R. § 12.42(e). In addition, if CBP determines, based on its investigation, that the goods were made with forced labor, and are being imported or are likely to be imported to the United States, CBP "will publish a finding to that effect in a weekly issue of the Customs Bulletin and in the Federal Register." 19 C.F.R. § 12.42(f). Any class of goods specified in the finding that is imported directly or indirectly from the locality identified in the

3

finding, and that have not been released from CBP custody prior to the date the finding is published in the Federal Register, shall be treated as an importation prohibited by section 1307. 19 C.F.R. § 12.42(g).  The importer will have the opportunity to "establish[] by satisfactory evidence" that the merchandise in a particular entry was not made with forced labor.  *Id.*

## II.    CBP's Investigations Of Forced Labor In Imported Goods

The Forced Labor Division (FLD) investigates alleged violations of 19 U.S.C. § 1307 using all investigatory tools at its disposal, including but not limited to the use of law enforcement sensitive information collected in the course of customs enforcement investigations.

CBP evaluates the facts obtained during its investigation, taking into consideration certain indicators of forced labor identified by the International Labour Organization (ILO) – a tripartite agency of the United Nations which "brings together governments, employers and workers of 187 Member States to set labour standards" and develop policies.[1]  Specifically, the ILO developed eleven indicators based on the definition of forced labor in the ILO Forced Labour Convention, 1930 (No. 29) – "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  This definition was adopted by Congress in 19 U.S.C. § 1307.  The following indicators, derived from the ILO's extensive experience and expertise evaluating forced labor situations around the world, are useful interpretive tools in investigating forced labor allegations and identifying forced labor: abuse of vulnerability; deception; restriction of movement; isolation; physical and sexual violence; intimidation and threats; retention of identity documents; withholding of wages; debt bondage;

---

[1] *See* https://www.ilo.org/global/about-the-ilo/lang--en/index.htm (last visited on Apr. 30, 2026).

abusive working and living conditions; and excessive overtime.[2]

The ILO's stated goal for promulgating the indicators is to "help 'front-line' criminal law enforcement officials … identify persons who are possibly trapped in a forced labour situation, and who may require urgent assistance." ILO Indicators. They are "the most common signs or 'clues' that point to the possible existence of a forced labour case." Id. Accordingly, when assessing the evidence gathered in its investigation, CBP looks to see whether these indicators of forced labor are present to help decide whether the statutory requirements are met; that is, whether work is "exacted . . . under the menace of any penalty" and whether the "worker does not offer himself voluntarily." 19 U.S.C. § 1307. Ultimately, CBP must utilize whatever tools necessary to determine whether to take any law enforcement action, such as issuing a WRO or a finding.

In addition to the listed indicators, the ILO continues to provide guidance and information on how forced labor has evolved over time, and how to identify different forced labor practices. In particular, in its 2005 publication, A Global Alliance Against Forced Labour [3] (2005 ILO Report), the ILO provided further guidance on what it means for an action be "under menace of a penalty" and separately what it means for an action to be voluntary. Id. at Part I. The ILO indicators are woven through this further guidance. With respect to "menace of a penalty," the ILO has explained:

> The penalty does not need to be in the form of penal sanctions, but may also take the form of a loss of rights and privileges. Moreover, the menace of a penalty can take multiple different forms. Arguably, its most extreme form involves physical violence or restraint, or even death threats addressed to the victim or relatives. There can also be subtler forms of menace, sometimes of a

---

[2] The ILO indicators of forced labor are found at: https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf (last visited on Apr. 29, 2026) (ILO Indicators).
[3] ILO, A Global Alliance Against Forced Labour, found at: https://www.ilo.org/publications/new-ilo-report-global-alliance-against-forced-labour (last visited Apr. 30, 2026).

> psychological nature. Situations examined by the ILO have included threats to denounce victims to the police or immigration authorities when their employment status is illegal, or denunciation to village elders in the case of girls forced to prostitute themselves in distant cities. Other penalties can be of a financial nature, including economic penalties linked to debts, the non-payment of wages, or the loss of wages accompanied by threats of dismissal if workers refuse to do overtime beyond the scope of their contract or of national law.  Employers sometimes also require workers to hand over their identity papers, and may use the threat of confiscation of these documents in order to exact forced labour.

*Id.*  The ILO has also described different aspects of what it terms "freedom of choice," or voluntariness, including the "form and subject matter of consent," "external constraints or indirect coercion," and the possible revocation of that consent, noting that there could be "subtle" forms of coercion.  *Id.*  The ILO further explained:

> Many victims enter forced labour situations initially of their own accord, albeit through fraud and deception, only to discover later that they are not free to withdraw their labour. They are subsequently unable to leave their work owing to legal, physical or psychological coercion. Initial consent may be considered irrelevant when deception or fraud has been used to obtain it.

*Id.*  This is consistent with other guidance provided by the ILO.[4]  *See also* ILO Indicators.

 CBP must determine whether evidence of forced labor meets the threshold for issuing either a WRO or a finding of forced labor, as that term is defined in the statute.

## III. CBP's Forced Labor Investigation And Initial Determination

 On September 27, 2021, CBP's FLD received a referral from CBP's Enforcement Operations Division (EOD) pursuant to 19 C.F.R. § 12.42(a).  EOD had reason to believe that Kingtom was producing merchandise in the Dominican Republic that is being, or is likely to be, imported into the United States in violation of 19 U.S.C. § 1307.  C.R. CBP 000066-70, P.R.

---

[4] ILO, What is Forced Labour?, available at: https://www.ilo.org/topics/forced-labour-modern-slavery-and-trafficking-persons/what-forced-labour (last visited Apr. 30, 2026).

CBP 000067-71.  FLD initiated an investigation pursuant to 19 C.F.R. § 12.42(d).  The referral included some of the observations indicative of forced labor that were later documented in EOD's October 28, 2021 Enforce and Protect Act (EAPA), on-site verification report.  C.R. CBP 000066-70, P.R. CBP 000067-71;[5] C.R. CBP 000095-132, P.R. CBP 000096-133.  The referral also contained WhatsApp text message screenshots provided by the EAPA site verification team which documented communications made between U.S Government (USG) personnel and workers at Kingtom's facilities.  C.R. CBP 000072-84, P.R. CBP 000073-85.

On March 3, 2022, defendant-intervenors, Aluminum Extruders Council (AEC) and the United Steel Workers (USW), submitted an allegation of forced labor against Kingtom highlighting many of the same concerns documented by the EAPA site verification team in its report, which defendant-intervenors supplemented on May 20, 2022.  P.R. CBP 000154-166; P.R. CBP 002069-2090.

FLD conducted its own investigation into the allegations of forced labor against Kingtom, initially identified by the EAPA team, and that investigation culminated in the Forced Labor Assessment.  C.R. CBP 000038-58.  As part of that investigation, between May 16-19, 2022, USG officials conducted interviews of sixteen then-current and former Kingtom workers.  These interviews confirmed the presence of seven of the ILO's forced labor indicators at

---

[5] "C.R." indicates a citation to the confidential version of the administrative remand record found at ECF No. 86.  "P.R." indicates a citation to the public version of the administrative remand record found at ECF No. 87.

7

Kingtom's factory.[6]  Additional record evidence was developed and considered.[7]

After reviewing the information, FLD recommended that CBP issue the Finding against Kingtom.  P.R. CBP 004296-4297.  On December 4, 2024, CBP published a notification in the Federal Register of CBP's Finding.  89 Fed. Reg. at 96,265.

### IV.    CBP's Forced Labor Investigation And Remand Redetermination

The Court in its opinion remanded this matter after concluding that CBP did not articulate a satisfactory explanation for its action in the public administrative record and the Finding. *Kingtom*, 805 F. Supp. 3d at 1325.  On December 19, 2025, CBP issued a remand redetermination that was filed with the Court on December 22, 2025.  ECF No. 81.  CBP reconsidered the information in the record and continued to determine that Kingtom is using forced labor in the Dominican Republic to produce or manufacture in whole or in part aluminum extrusion and profile products and derivatives, and that such products are being or likely to be imported into the United States in violation of section 1307.  Redetermination at 1.

---

[6] Transcripts of Kingtom worker interviews can be found in the confidential record with portions now available in the public record:  C.R. CBP 000292-361, P.R. CBP 000318, 320, 341-342, 346; C.R. CBP 000364-475, P.R. CBP 000398-402, 433-434, 439, 442; C.R. CBP 000482-609, P.R. CBP 000501, 516, 600; C.R. CBP 000616-618; C.R. CBP 000619-718, P.R. CBP 000635, 650, 652, 665, 691-695; C.R. CBP 000725-822, P.R. CBP 000726, 764, 766-767, 790-791, 815-816; C.R. CBP 000825-935, P.R. CBP 000826, 853-856, 900-901, 912-913, 915, 920-922; C.R. CBP 000940-1007, P.R. CBP 000941, 961-964, 971-972, 975-976, 979-982, 999-1000; C.R. CBP 001012-1052, P.R. CBP 0001013-1014, 1024-1025, 1031-1037; C.R. CBP 001055-1108, P.R. CBP 001056-1057, 1062, 1082-1086, 1092-1094; C.R. CBP 001140-001251, P.R. CBP 001141, 1199-1202, 1245; C.R. CBP 001774-1875, P.R. CBP 001775, 1815, 1817, 1819, 1848; C.R. CBP 001880-1971, P.R. CBP 001881, 1900, 1920, 1946-1947, 1953-1954; C.R. CBP 001980-2065, P.R. CBP 001981, 1997-1998, 2011-2013, 2033-2037, 2039-2045, 2054-2055; C.R. CBP 002066-2067, P.R. CBP 2067-2068.

[7] *See e.g.,* C.R. CBP 001122-27; C.R. CBP 000476-77; C.R. CBP 000171-172; C.R. CBP 000173-174; C.R. CBP 000175-176; C.R. CBP 000177-178; C.R. CBP 001637-1638; P.R. CBP 001638-1639; C.R. CBP 001639-1640; P.R. CBP 001640-1641; C.R. CBP 000071-84, P.R. CBP 000072-85; C.R. CBP 000088-95; C.R. CBP 000134-148.

CBP relied on the definition of forced labor in section 1307.  CBP looked to the ILO for guidance and considered the definition of "menace of penalty" to mean "a wide range of penalties or threatened penalties used to compel someone to work."  Redetermination at 3.  The ILO also defines "offered voluntarily" as "free and informed consent of a worker to take a job and his or her freedom to leave at any time.  *Id*.  This is not the case, for example, when an employer or recruiter makes false promises so that a worker take[s] a job he or she would not otherwise have accepted."  *Id*.  CBP explained that the evidence supported the forced labor elements of "involuntar[iness]" and "menace [of any] penalty."  *Id*. at 8-19.  Seven of the ILO's forced labor indicators, described below, were found at Kingtom's factory.  *Id*.

Abuse of Vulnerability

Kingtom took advantage of workers' vulnerabilities, in particular employee's immigration status.  Redetermination at 8-11; C.R. CBP 000221-226, P.R. CBP 000222-227.  Of the sixteen interviews conducted, nine were employees of Haitian descent and seven of those nine were illegally present in the Dominican Republic or working without a visa while employed at Kingtom.  Redetermination at 9.  Both Haitian and Dominican workers reported that Kingtom reviewed or made copies of worker's identity documents and were aware of their immigration status.  *Id*.

Haitian workers, not legally in the country, were reportedly treated worse than their Dominican colleagues due to their immigration status, and lack of legal documentation.  *Id.* at 9. Kingtom used the nationality and legal status of workers as leverage to deter those unlawfully residing in the Dominican Republic from resisting orders or reporting mistreatment.  *Id.* at 9-10. Further, Kingtom would target Haitian workers with physical abuse because of their lack of knowledge of the law and vulnerable immigration status made it unlikely that Kingtom would

9

face any repercussions. *Id.* at 9-10. One worker stated that Kingtom preferred to hire undocumented Haitians due to Haitian workers' fear of company management which enabled Kingtom to control them. *Id.* at 10.

Dominican workers were also vulnerable. *Id.* Dominican workers reported unfair treatment by Kingtom leadership. *Id*. Kingtom imposed fines or terminated workers if they did not meet demands such as working seven days or taking longer than one to two minutes for a bathroom break. *Id*. at 10-11.

Deception

Kingtom deceived workers when it did not fulfill its promises to workers about payment of wages, including when they would be paid, the work to be performed, work conditions, rules, fines, contracts, employment documentation, time off, vacation days, bonuses, and/or healthcare, all to entice them into working. *Id.* at 11 and note 43; C.R. CBP 000258-264, P.R. CBP 000259-262.

Workers were also deceived during the COVID-19 pandemic when Kingtom required workers to live and work at the factory 24 hours a day, seven days a week without being allowed to go home. Redetermination at 12. This continued for, in some instances from two-and-a-half up to seven-and-a-half months. *Id*.

Restriction of Movement

Workers experienced or observed restricted movement while employed at Kingtom. Redetermination at 12 and note 48. The workers were restricted from leaving. Redetermination at 12; C.R. CBP 000272-277, P.R. CBP 000273-278. For example, workers were prohibited from leaving work posts, going out to lunch, or going to the bathroom. Redetermination at 13 and note 49. The workers reported that there were armed guards stationed at the exits of the

10

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

Kingtom facilities and that workers were not allowed to leave until their shifts were complete. Redetermination at 13; C.R. CBP 000599-600, P.R. CBP 000600; C.R. CBP 000919-920, P.R. CBP 000920-921.

### Physical and Sexual Violence

Further, workers were subjected to physical violence and occasional accounts of sexual violence. Redetermination at 13-15 and note 53. Kingtom management hit, kick, and beat workers. Redetermination at 14. Workers reported [[ █████████████████████ █████████████████████████████████████ ]] C.R. CBP 000279. Workers were harassed, grabbed, and pinched by Kingtom leadership all the time. Redetermination at 15 and note 61.

### Withholding of Wages

Wages were consistently withheld. Redetermination at 15-16; C.R. CBP 000284-289, P.R. CBP 000285-290. If workers took a day off, their wages for the day were withheld and a fine was applied. Redetermination at 15. Workers would be fined for not working seven days a week, twelve hours a day. *Id*.

Kingtom imposed fines and penalties for various reasons including going to the bathroom without permission, sitting down, and forgetting to clock in and out. *Id.* at 15-16. Kingtom imposed significant monetary fines on workers for minor infractions as a mechanism to withhold wages from workers' paychecks every pay period. C.R. CBP 000285-289, P.R. CBP 000286-289.

### Intimidation and Threats

Kingtom threatened workers which included threats of physical violence, denunciation to the immigration authorities, and the inability to leave the workplace. Redetermination at 16.

Kingtom used threats and intimidation to coerce vulnerable workers. *Id*. at 16-17. Kingtom management made demands such as working uncompensated overtime, not speaking with the Dominican Republic Ministry of Labor (DRMOL) personnel, or not missing a single day at work. *Id*. at 17. Kingtom routinely physically abused workers to coerce them to work harder or comply with specific demands. *Id*. at 17-18.

Excessive Overtime

Workers were required to work every day of the week. *Id.* at 18-19. Workers were required to work excessive overtime hours, often working 12 hours per day every day of the week. *Id*. and note 85; C.R. CBP 000266-67, P.R. CBP 000267. Workers were also not being paid for the overtime. Redetermination at 19.

*        *        *

There was no evidence of Kingtom's remediation of the forced labor concerns identified. *Id.* at 20-21. Kingtom's facilities closed on May 6, 2022, due to labor issues, such as deficient work conditions and practices that endangered the lives of workers. *Id*. Kingtom reopened approximately two weeks later which was insufficient time to implement meaningful remediation practices. *Id*. Kingtom closed for a second time on July 25, 2024, due to ongoing violations that included excessive working hours and unsafe working conditions. *Id.* at 21.

Upon review of the evidence on the administrative record, CBP found that there was the presence of forced labor under section 1307 warranting a finding under 19 C.F.R. § 12.42(f) and that the aluminum extrusions produced by forced labor at Kingtom's facilities were being or likely to be imported into the United States. *Id*. at 22.

12

**ARGUMENT**

**I.      Standard Of Review**

The scope of judicial review for actions commenced under 28 U.S.C. § 1581(i) is found in 28 U.S.C. § 2640(e), which directs the Court to 5 U.S.C. § 706, and is "highly deferential" to the agency, here CBP. *See Islamic Am. Relief Agency (IARA-USA) v. Gonzales*, 477 F.3d 728, 733 (2007). The Court will "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … (C) in excess of statutory … authority … [or] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title…." 5 U.S.C. § 706(2); *see also Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018); *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003). Pursuant to this standard, the Court: (1) must consider whether the agency's decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between the agency's factual findings and its ultimate action. *Consol. Fibers, Inc., et al. v. United States*, 535 F. Supp. 2d 1345, 1353-54 (2008). The Court's review in section 1581(i) actions is limited to the administrative record developed before the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

An agency's decision may be arbitrary and capricious where it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of

13

the agency," *id.* at 30, and it must "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned." *Nat'l Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C.

Cir. 2013) (quoting *State Farm*, 463 U.S. at 43). That is, the agency's decision should be

affirmed as long as there is a "rational connection between the facts found and the choice made."

*State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156,

168 (1962)).

The substantial evidence standard means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed.

Cir. 2000). While the Court examines "the record as a whole, taking into account evidence that

both justifies and detracts from an agency's decision," "the possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding

from being supported by substantial evidence." *Id.* (quoting *Consolo v. Fed. Maritime Comm'n*,

383 U.S. 607 620 (1966)). And "the Court may not substitute its judgment for that of the

[agency] when the choice is between two fairly conflicting views, even though the court would

justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus.*

*Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal

quotations omitted) (second alteration in original).

Where, as here, the agency's decision after remand is under consideration, the Court

"also reviews the Remand Results for compliance with the court's remand order." *Diamond*

*Tools Tech. LLC v. United States*, 609 F. Supp. 3d 1378, 1382 (Ct. Int'l Trade 2022) (internal

quotation marks and citation omitted).

14

Here, the agency has complied with the remand order, its decision was not arbitrary and capricious, and the substantial evidence standard is met by the ample record evidence of forced labor in this case.

## II.    CBP's Investigation, Analysis Of The Evidence, And Issuance Of The Finding Using The ILO Indicators Were Consistent With Both 19 U.S.C. § 1307 And The Implementing Regulations

Kingtom challenges CBP's legal analysis and its Finding of forced labor, claiming that CBP impermissibly "substitut[ed]" the ILO indicators for the statutory definition of forced labor, creating requirements beyond those identified in the statute. Kingtom Comments at 5-13. But CBP made no such substitution; instead, it acted properly when considering ILO guidance in applying the statute.

Again, Congress and the ILO use the exact same language to define forced labor. CBP properly considered the indicators set forth by the ILO, the pre-eminent international labor organization that provides guidance not only to CBP, but internationally, and to the U.S. Courts, when grappling with the concept of forced labor. Citing the ILO, CBP explained that for work performed under "menace [of any] penalty" includes a "wide range of penalties or threatened penalties used to compel someone to work." Redetermination at 3 (citing ILO What is Forced Labour?). Similarly, the agency noted that it is "not voluntarily" when an employer "makes false promises so that a worker take[s] a job he or she would not otherwise have accepted." *Id.* The words of the statute support such a reading. That CBP looked to the ILO for guidance on the circumstances under which work is performed under "menace of any penalty" and when it is "voluntar[y]" does not, in any way, alter the statutory requirements of section 1307.

It is plaintiff that attempts to narrow the terms of the statute such that only "slavery" or "conscript labor" are considered forced labor, Kingtom Comments at 6-9, which is inconsistent

15

with the plain language.  CBP's analysis was entirely proper, and its conclusion supported by the record.

### A.  CBP's Analysis Of The Statutory Language And Consideration Of ILO Guidance Was Appropriate

The first step in any statutory analysis is the plain language.  Indeed, "'[i]t is a fundamental cannon of statutory construction that . . .words will be interpreted as taking their ordinary, contemporary, common meaning' which may be derived from '[d]ictionaries from the era of [the statutory provision]'s enactment." *New York and Presbyterian Hospital v. United States*, 881 F.3d 877, 882 (Fed. Cir. 2018).  It is only when the words are ambiguous that Courts look beyond the language of the statute.  *Glaxo Operations UK Limited v. Quigg,* 894 F.2d 392, 395 (Fed. Cir. 1990) ("When ... the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." (quoting *United States v. James,* 478 U.S. 597, 606 (1986)).  Here, the statutory parameters for the definition of forced labor are clear, and CBP's consideration of ILO guidance assisted CBP in applying the statutory language.

As stated above, forced labor is work "exacted … under the menace of any penalty for its nonperformance and for which the worker[s did] not offer [themselves] voluntarily."  19 U.S.C. § 1307.  "Exact" or "exacted" is defined by *Funk & Wagnalls New International Dictionary of the English Language* (1987) *(Funk & Wagnalls)* at 441, as "1. To compel the yielding or payment of; extort.  2. To demand; insist upon as a right. 3. To require; call for:" and by *Webster's Ninth New Collegiate Dictionary* (1991) *(Webster's)* at 431, as "1. to call for forcibly or urgently and obtain. … *syn* see DEMAND."  Menace is defined in *Funk & Wagnalls,* as "1. To threaten with evil or harm.  2. To make threats of. – *v.i.* 3. To make threats; appear threatening." *Id*. at 795.  *Webster's* defines "menace" as "1. a show of intention to inflict harm ; THREAT  2. a: one that represents a threat: DANGER; b. a person who causes annoyance."  *Id*. at 741.  A

"penalty" is defined by *Oxford Learner's Online Dictionary* as "1. A punishment for breaking the rule or contract; 2. A disadvantage suffered as a result of something." Finally, "voluntary" is defined by *Merriam-Webster Online Dictionary* as "1 : proceeding from the will or from one's own choice or consent  2 : unconstrained by interference." Forced labor under section 1307 (and according to the ILO) is, therefore, work that is required or demanded under threat (or application) of some type of punishment, for which one does not offer themselves of their own choice. CBP referenced the ILO guidance, not to create additional requirements[8] or "substitute[] them for the statutory definition," Kingtom Comments at 10, but to further assist in applying the plain meaning of the statutory terms.[9]

Indeed, it is sometimes difficult to decipher the nuances of when work is being demanded under threat of some penalty, or under what circumstances work is no longer voluntary. The ILO, experts in this area, provide guidance consistent with the plain meaning of the statutory

---

[8] The cases cited in arguing that CBP is imposing additional requirements are inapposite. In *M.M. & P. Maritime Advancement, Training, Education & Safety Program v. Dept. of Commerce*, 729 F.2d 748 (Fed. Cir. 1984), for example, by statute, an article was entitled to duty free treatment if, among other things, it is "entered for the use of any nonprofit institution . . . established for educational or scientific purposes." *Id*. at 749. Commerce read that to include only items used for "scientific research or formal *science-oriented* education." *Id.* at 751. That plainly added the requirement that the educational purpose must be "science-oriented" which is not in the statute. Here, instead, we interpreted the statute in accordance with its plain meaning, without any additional requirements. CBP used the ILO guidance simply to analyze the factual evidence. There was no requirement that specific ILO identifiers be present.

[9] Kingtom, on several occasions, references the Supreme Court's decision in *Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024). Kingtom Comments at 4, 10. That decision, however, is not relevant to the question here. In *Loper*, the Court overruled *Chevron U.S.A. Inc. v. National Resources Defense Counsel, Inc.* 467 U.S. 837 (1984), (referred to as *Chevron* deference) which permitted courts to defer to an agency's interpretation of a statute, even when a reviewing court read it differently. *Id.* at 369. *Loper* held that legal interpretation is "emphatically, the province and duty of the judicial department . . ." *Id.* at 412 (internal quotation marks omitted), and that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* The Government has not asked for the Court to defer to the agency's interpretation, but analyzes the statute according to its plain meaning.

17

language, noting that "offered voluntarily," in this context, means "free and informed consent of a worker to take a job and his or her freedom to leave at any time." Redetermination at 3. The ILO indicators are intended to provide "the most common signs or 'clues' that point to the possible existence of a forced labour case." ILO Indicators. CBP considered the ILO indicators, and other guidance from the ILO, simply to assist in evaluating the facts identified during the forced labor investigation to determine whether the statutory requirements were met. This is not, in any way, inconsistent with the language of 19 U.S.C. § 1307, or its implementing regulations. Indeed, there is nothing in the statute, or CBP's regulations promulgated pursuant to its statutory authority, that prohibit CBP's use of the ILO indicators as a guide in analyzing the facts. As is often the case, neither the statute nor the regulations specify *how* the agency should review the evidence, just that it determine that the statutory requirements are met.

And, the ILO indicators and other guidance are more than simply a logical lens from which to view evidence of forced labor in the context of section 1307 – they are the international standard for assessing forced labor which has been relied upon by federal courts when considering claims of forced labor, and are consistent with statutory language. *Velez v. Sanchez*, 693 F.3d 308, 320 (2d Cir. 2012) (discussing ILO guidance as the starting point for evaluating forced labor); *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1013-14 (S.D. Ind. 2007) (using ILO guidance in its review of forced labor facts).

In *Bridgestone*, for example, the Court references the 2005 ILO Report, discussed above, to identify facts that often indicate lack of consent (or lack of voluntariness) such as: physical confinement in the work location, "psychological compulsion, i.e. an order to work backed up by a credible threat of a penalty for non-compliance," deception or false promises regarding types and terms of work, withholding of wages and retention of identity documents. *Bridgestone,* 492

18

F. Supp. 2d at 1013 (citing 2005 ILO Report).  Similarly, the Court references the ILO Report to identify facts that indicate that work was being performed under "menace of a penalty," such as when it is performed under threat of the following: physical violence against a worker, physical confinement, denunciation to authorities and deportation, dismissal from current employment, removal of rights or privileges and deprivation of food, shelter, etc.  *Id.* at 1014.  In *Velez,* the Second Circuit referenced the same 2005 ILO Report.  The *Velez* Court noted specifically that menace of any penalty, as used in the ILO definition and in 19 U.S.C. § 1307 "does not necessarily need to be a physical penalty but can include credible threats of financial penalties, denunciation to immigration authorities and deportation."  693 F.3d at 321 (citing 2005 ILO Report).  The *Velez* Court further notes that labor can be "'forced' if it takes place in a 'climate of fear' in which consent is impossible, even if the victim is not threatened directly with any penalty."  *Id.*

Finally, guidance from the ILO is identified in both Congressional reports and referred to specifically by government agencies as being relevant to identifying a forced labor situation. Specifically, the ILO indicators of forced labor are identified and relied upon in the Forced Labor Enforcement Task Force's (FLETF) *Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China*, Department of Homeland Security (June 17, 2022), at 20-22, https://www.dhs.gov/uflpa-strategy, a report required by Congress under the Uyghur Forced Labor Protection Act, P.L. 117-21 (Dec. 23, 2021), at 2(c).  They are used to identify forced labor of Uyghurs and other persecuted groups in Xinjiang, China.  Additionally, CBP has publicly identified the ILO on its own website as being used to identify forced labor situations.[10]

---

[10] https://www.cbp.gov/trade/forced-labor/leveling-playing-field (last visited April 30, 2026).

Kingtom's assertions that consideration of ILO indicators is impermissible fundamentally misunderstands their purpose. CBP did not "expand the statute or substitute the ILO indicators in place of the definition." Kingtom Comments at 6. They are simply a mechanism, derived from experts in the field, used by law enforcement officials to identify and understand common signs of forced labor, as that term is defined by both the ILO and by Congress. *See* ILO Forced Labour Convention, (No. 29) June 28, 1930, 39 U.N.T.S. 55. The ILO readily explains that each forced labor assessment is different and that, in some cases, one indicator might be enough to show forced labor, while others might require several indicators taken as a whole. *Id.* CBP's use of various forced labor indicators is a reasonable means by which to sift through evidence to make its determination. The indicators served to help CBP decisionmakers understand holistically the labor situation at Kingtom's facilities. Accordingly, CBP did not err, nor did it exceed its statutory authority, by using the ILO indicators as a guide in determining whether forced labor was occurring at Kingtom's facilities.

**B. Kingtom's Analysis Of The Statutory Language Is Overly Narrow And Incorrect**

Kingtom attempts to narrow the statutory definition of forced labor beyond what the plain language dictates and argues that its actions do not satisfy the statutory standard. Kingtom's analysis and conclusion are wrong.

First, Kingtom points to a discussion of a tariff bill, in 1929, by the Senate, which included the addition of the current language in § 1307, arguing that forced labor was intended to include only "conscript labor or slavery." Kingtom Comments at 7 ("Congress cabined the meaning of limited forced labor to conscript labor and slavery."). While forced labor includes

20

"conscript labor" or "slavery,"[11] the term also includes a much broader sets of facts – all work that is required or demanded under threat of some type of punishment, for which one does not offer themselves of their own choice. If Congress had intended for forced labor to be limited to conscript labor or slavery, it would have included that language in the statute. The statutory language is not restricted to those circumstances.

Kingtom relies on snippets of commentary by Senator Blaine to support its position that the meaning of forced labor is limited to extreme cases. Kingtom Comments at 7. However, this reliance is misplaced. A full reading of the Congressional record from 1929 reveals that Senator Blaine sought to expand, not limit, the scope of what is considered "forced labor," by advocating for the language that is currently part of the statute. *See* 71 CONG. REC. S4,478, 4,490-91 (daily ed. Oct. 14, 1929). There was, as plaintiff acknowledges, a discussion of conscript labor and slave labor, but there was no debate that both would be covered by the statute. *See* Kingtom Comments at 7. At the time, Senator Blaine was concerned for the circumstance where individuals were signing work contracts that they did not necessarily understand. 71 CONG. REC. at 4,490-91. Mr. Blaine noted that even if a person *voluntarily* signs a contract to work, it may still be forced labor. *Id.* Specifically, when asked if he agrees that when a person enters a contract to work it is not forced, Mr. Blaine stated:

> I do not agree with that definition of forced labor. That definition of forced labor is used designedly by countries that are employing forced labor in order that they may continue a method of servitude analogous to slavery. Let me say here and now that therein lies the curse of and the objection to the League of Nations. It was set up for the purpose of legalizing that which was wrong and giving

---

[11] Conscript labor is work that is mandatory state-imposed service, which at the time of the statute's passage was prevalent in countries that the United States was trading with, and "slavery" is defined by *Merriam-Webster's Online Dictionary* as "1 a: the practice or institution of holding people as chattel involuntarily and under threat of violence 2: submission to a dominating influence."

> those things character through the pretense of legalizing this type of labor. The definition is wrong. We will take, for instance, a native of any of the tropical countries. He has been in his tribal relations under the government of a chief and counsel. He is unlearned. He is illiterate. He does not know a single figure in the multiplication table. He does not recognize a single letter in Arabic or any other alphabet. That man is not capable of protecting his labor. . . . That type of labor, of course, is voluntarily rendered under the definition of the covenant but that type of labor is enforced labor. The pressure put upon the laborer is such that he cannot escape that kind of contract.

*Id.* Mr. Blaine spoke of the specific forced labor concerns at the time, which certainly fit within the plain meaning of the statutory terms. Whether a worker has "*no right to choose* whether to work or to leave employment," Kingtom Comments at 7 (emphasis added), is not always apparent. Forced labor is an evolving concept and not only limited to the circumstances discussed in 1929.

Next, although Kingtom acknowledges that the language in section 1307 and the ILO is identical with respect to their definition of "forced labor," plaintiff misconstrues the meaning of the statute. Kingtom cites to cases, which adopt and apply the ILO guidance, to argue that "forced labor" only involves factual scenarios such as "starvation, beatings, physical and mental torture . . . threats of execution . . . international trafficking . . . [and people] held in captivity who suffered severe injuries as a result of their work, were denied medical treatment, and risked imprisonment, death, and the persecution of their families by the Cuban government if they escaped." Kingtom Comments at 8. Moreover, Kingtom incorrectly claims that "Federal Courts . . . have concluded that the term does not have the broad application and wide-ranging implications that Customs has grafted onto it in this case." *Id.* at 7. Kingtom's analysis is incorrect. As with the legislative history, the statutory language is not so limited. While the circumstances at issue in the cited cases, *e.g. Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674

22

(S.D. Tx. 2009) (involving individuals trafficked against their will), or *Deutsch v. Turner Corp.,* 324 F.3d 692 (9th Cir. 2003) (involving individuals who worked as slave labor during World War II), may constitute forced labor, forced labor under 19 U.S.C. § 1307 is not limited to the circumstances described in those cases

Notably, the cases Kingtom cites do not discuss the statutory terms in 19 U.S.C. § 1307. Instead, many apply the Alien Tort Statute (ATS), which provides federal court jurisdiction over a tort claim where actions are "committed in violation of the law of nations or a treaty of the United States." *See Velez*, 693 F.3d at 316 (quoting 28 U.S.C. § 1350); *Adhikari*, 697 F. Supp. 2d at 681 (applying ATS); *Aragon v. Che Ku*, 277 F. Supp. 3d 1055 (D. Minn. 2017) (applying ATS). Under the ATS, individuals bring a claim for relief or damages in Federal Court for violations of certain international norms – one of which is forced labor. Although the Court can certainly consider these cases as guidance when analyzing forced labor situations, section 1307 relates strictly to whether CBP has a basis to believe that goods made by an entity are made (in whole or in part) with forced labor such that those goods should not be permitted entry into the United States stream of commerce; it does not involve a private right of action for violations of international norms. Further, the plain language of section 1307 does *not* require physical violence or confinement. Instead, it is work "exacted . . . under the menace of any penalty for its nonperformance." 19 U.S.C. § 1307.

Moreover, contrary to Kingtom's contentions, the cited cases do not limit forced labor, even under the ATS, to beatings, mental torture, the threat of execution or being trafficked in cargo holds. Kingtom Comments at 8. To be sure, the Court in *Aragon*, 277 F. Supp. 3d 1055, cited by Kingtom, relies on the Federal Circuit's decision in *Velez*, which held that "menace of penalty . . . can include credible threats of financial penalties, denunciation to immigration

23

authorities and deportation" and further held that "forced labor can occur in a 'climate of fear' without any express threat of penalty." *Id.* at 1068-69.  Certainly, forced labor scenarios are not as limited as plaintiff states.  In *Aragon*, defendant's motion to dismiss was denied where plaintiffs alleged that they were subject to physical violence, periodic physical restraint and threats of deportation, which prevented the individual from leaving her employment.  *Id.* at 1068.  Those allegations are very similar to the facts here, and distinct from slavery or conscript labor.  That other fact patterns are more severe, *i.e., Adhikari,* 697 F. Supp. 2d 674, and *Deutsch v. Turner Corp.*, 324 F.3d 692, does not indicate that only the most severe are violative of section 1307.

The "restriction of human freedom," Kingtom Comments at 9, therefore, need not be physical restriction in order for work to be involuntary, but restriction includes the psychological belief that a worker will suffer penalty if work is not continued – facts that plainly exist here.

**III.   CBP's Redetermination Is Neither Arbitrary Nor Capricious And Is Supported By Substantial Evidence**

Kingtom argues that the evidence does not establish forced labor, in that work was involuntary or exacted under the menace of penalty.  Kingtom Comments at 13-24.  CBP's conclusion that Kingtom was using forced labor to manufacture its aluminum extrusions and derivatives, was explained and supported by substantial evidence in the public administrative record.  An agency's determination should be upheld if the "agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43.  Here, the Redetermination provides the requisite facts and a discernable path leading to a reasonable conclusion that Kingtom was producing goods, in whole or in part, using forced labor.

24

### A. Substantial Evidence Of Menace Of Penalty

Section 1307 defines forced labor as work which is exacted under "menace of any penalty" – which means that that the work was conducted under threat of some kind of punishment. Kingtom asserts that the menace of penalty must compel the employee to work and argues that the Redetermination's reference to several ILO factors to meet this aspect of forced labor is insufficient. Kingtom Comments at 20. Kingtom is wrong. While it is true that the threats must be related to the continued work, Kingtom's view of what is required to make that showing is inappropriately narrow. The Redetermination and administrative record support a conclusion that work was performed under menace of penalty. It was the environment of fear created, and the level of control exercised by Kingtom, that compelled continued work from its employees, satisfying this element.

As a threshold matter, Kingtom does not (and cannot) dispute that evidence of physical and sexual violence at its facilities exists, that wages were withheld, that the workers were intimidated (particularly undocumented workers), other than its blanket assertion that *all* of the evidence is "not credible." *Id.* Instead, Kingtom asserts that these actions somehow do not indicate that a forced labor condition existed – or that work was performed under "menace of penalty." *Id*. However, the connection between the threats and continued work need not be as overt as Kingtom believes. Forced labor is often subtle and nuanced. Indeed, it can include a wide range of conditions, including physical violence or restraint as well as psychological compulsions which may not be as easy to decipher. All of this evidence would be indicative of the fact that work is performed because of the fear of some penalty. 2005 ILO Report. It is recognized that forced labor is labor that can be "'forced' in that it takes place in a climate of fear

25

in which consent is impossible, even if the victim is not threatened directly with any penalty."

*Velez*, 693 F.3d at 321.  These circumstances exist here.

As the Redetermination notes, Kingtom created a climate of fear so as to control the workers, compelling continued work.  Kingtom regularly deliberately inflicted punishment for some perceived wrongdoing contributing to this environment.  *Bridgestone*, 492 F. Supp. 2d at 1018.  The Redetermination cites to evidence of several ILO indicators, such as intimidation and threats, physical and sexual violence, abuse of vulnerability and withholding of wages to support that work was performed under menace of penalty.

To be sure, physical and sexual abuse is a method by which an employer is able to exercise greater control over its workers to compel them to perform certain tasks.  Here there was evidence that employees were hit, kicked, and beaten with sticks, helmets, metal profiles, and even a hot iron, by Kingtom management.  Redetermination at 13-15; C.R. CBP 000269-271, P.R. CBP 000270-272; C.R. CBP 001588-89, P.R. CBP 001589-90; C.R. CBP000341, P.R. CBP000342; C.R. CBP 000899-900, P.R. CBP 000900-901; C.R. CBP 001023, P.R. CBP 001024; C.R. CBP 001350-1352, P.R. CBP 001351-1353; C.R. CBP 001466, P.R. CBP 001467; C.R. CBP 001816, P.R. CBP 001817; C.R. CBP 002036, P.R. CBP 002037.  Physical violence was prevalent in the Kingtom factory.  C.R. CBP 000438, P.R. CBP 000439; C.R. CBP 000515, P.R. CBP 000516; C.R. CBP 000649, 000651; P.R. CBP 000650, 000652;  C.R. CBP 000975, P.R. CBP 000976;  C.R. CBP 001814, P.R. CBP 001815; C.R. CBP 002044, P.R. CBP 002045.  One worker reported that "if at the moment they [Kingtom leadership] get mad, and they are arguing, they would find any stick, anything, and hit people with it."  C.R. CBP 001023, P.R. CBP 001024.  Workers were harassed, grabbed, and pinched by Kingtom leadership all the time.  Redetermination at 15 and note 61; C.R. CBP 000814-815, P.R. CBP 000815-816.

26

Threats of financial penalties are also evidence of menace of penalty. *Velez*, 693 F.3d at 321. Here, Kingtom did not only threaten financial penalties but also withheld wages by imposing fines and penalties. Penalties were imposed for reasons including going to the bathroom without permission, sitting down, and forgetting to clock in and out. Redetermination at 15-16; C.R. CBP 000259, P.R. CBP 000260; C.R. CBP 000285, P.R. CBP 000286. Kingtom threatened to fire workers for noncompliance if they did not comply with unreasonable demands such as working uncompensated overtime, working long hours, or not missing a day of work. Redetermination at 17-19; C.R. CBP 000279-283, P.R. CBP 000280-284. As with the physical and sexual abuse, these tactics are used to exercise greater control to ensure workers remain in the factory. Kingtom used threats and intimidation to coerce vulnerable workers into accepting unfavorable conditions. Redetermination at 17-18.

Moreover, during the COVID-19 pandemic, workers were "locked in' the factory to continue work. C.R. CBP 000222, P.R. CBP 000223. There were accounts that the period of time was almost a year-and-a-half, while others mentioned seven-and-a-half months. C.R. CBP 000274, P.R. CBP 000275; C.R. CBP 000224, P.R. CBP 000225. One worker said he "felt like a prisoner because he was locked up." C.R. CBP000664, P.R. CBP 000665. Separate from the COVID-19 pandemic, Kingtom leadership often did not let a worker leave the factory before work was completed for the day. C.R. CBP 000599-600, P.R. CBP 000600; C.R. CBP 000919-920, P.R. CBP 000920-921. Workers had no choice but to stay in the factory and work.

Despite the multitude of abuses by Kingtom which created the "climate of fear in which consent is impossible," *Velez*, 693 F.3d at 321, Kingtom argues that the workers accepted the conditions of employment even if those conditions were abusive. Kingtom Comments at 23. Kingtom's contention fails to take into account the overall environment that Kingtom leadership

27

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

created and to which the workers were subjected. The workers believed they did not have a choice in their employment and Kingtom took advantage of their vulnerabilities.

This is particularly true for workers from Haiti. Haitian workers had the added concern of denunciation to immigration authorities and deportation. *Velez*, 693 F.3d at 321. For example, many workers continued to work because they were undocumented, a fact of which Kingtom was aware. Kingtom used the nationality and legal status of workers as leverage to deter those unlawfully residing in the Dominican Republic from resisting orders or reporting mistreatment. Redetermination at 9-10. As stated above, Haitian workers were compelled to remain at Kingtom's factory because they did not have legal documents or work visas. C.R. CBP 000222-226, P.R. CBP 000223-227. Indeed, there was a belief among the Haitian workers, that they were "obligated to work," regardless of the conditions. P.R. CBP 000224-225. They had a legitimate fear of being reported to immigration authorities and deported. Kingtom knew of the workers' immigration status and used that threat to subject workers to abuses. C.R. CBP 000224, P.R. CBP 000225 ("[T]he Haitians didn't have documents, they had no rights."); C.R. CBP 000225, P.R. CBP 000226 (Kingtom "prefer[s] to work with undocumented people" because [[███████████████████████]]); C.R. CBP 000224 ("Haitians have to show their passports."); C.R. CBP 001381. One worker stated that Kingtom preferred to hire undocumented Haitians because they feared company management, which enabled Kingtom to control them. Redetermination at 10; C.R. CBP 000222-226, P.R. CBP 000223-227. That worker reported that Kingtom knew of his legal status because they looked through his passport and saw that he did not have a visa and felt that he could not leave the job. C.R. CBP 000222, P.R. CBP 000223. One worker stated that if he went to Kingtom and [[████████████]]

███████████████████████████████████████████████████████

██████ ]] C.R. CBP 000224.

Haitian workers were told that they could be fired without full payment of wages, fined, and suffered physical or verbal abuse. Redetermination at 9-10. Kingtom targeted Haitian workers with physical abuse because, according to the interviewed workers, their lack of knowledge of the law and vulnerable immigration status made it unlikely that Kingtom would face any repercussions. C.R. CBP 000222-226, P.R. CBP 000223-227. Kingtom leadership hit Haitians, threatened to fire them or subjected them to abuses in excess of that suffered by Dominicans. *Id*. Haitians who did not have papers did not want to be stopped by the police and thought they would end up in jail or encounter issues with law enforcement. C.R. CBP 001036; P.R. CBP 001037; C.R. CBP 001049; C.R. CBP 001070. They believed Kingtom was going to help them get identification documents but Kingtom did not do that. C.R. CBP 001036; P.R. CBP 001037.

All these facts, taken together, establish that work was performed under "menace of penalty."

**B. Substantial Evidence That Labor Was Not Voluntary**

Kingtom disputes the agency's conclusion that workers were not rendering their labor voluntarily, challenging both the factual basis for the conclusion as well as CBP's legal analysis. Kingtom Comments at 14-19. On both fronts, Kingtom is wrong. Specifically, Kingtom again challenges CBP's use of the ILO indicators in its analysis and claims that CBP failed to link the evidence relied upon to the requirement that labor be involuntary. *Id.* at 13. Kingtom appears to believe that if a worker is "permitted to quit and leave their employment" then it is voluntary. *Id*. at 14. This oversimplifies the analysis. Indeed, Kingtom preyed on the vulnerabilities of its

29

workers such that the work could no longer be considered voluntary.

The Redetermination relied on the ILO in defining the statutory phrase "offered voluntarily," which is consistent with the plain meaning of the term voluntary (identified above and by Kingtom) from *Merriam-Webster Online Dictionary* as "1 : proceeding from the will or from one's own choice or consent  . . . . 2 : unconstrained by interference." *See* Kingtom Comments, Attach 1.  Kingtom, however, imagines that the workers are free to quit and leave employment because they can physically walk out the door.  While even that simplistic view is not always true (since they are not always physically able to leave, *see e.g.*, C.R. CBP 000222, P.R. CBP 000223; C.R. CBP 000599-600, P.R. CBP 000600) the meaning of "voluntary" encompasses the element of choice "unconstrained by interference," *Merriam-Webster Online Dictionary*, Kingtom Comments at Attach. 1, otherwise stated as "free and informed consent." Redetermination at 3.  Notably, in its brief, Kingtom conspicuously omits that, to be voluntary, the choice must be "unconstrained by interference."  Kingtom Comments at 14.

Again, a review of the *Bridgestone* decision, cited by plaintiff herein, is instructive with respect to the standard for lack of consent (or lack of voluntariness).  Referencing the 2005 ILO Report, the *Bridgestone* Court identifies the facts that indicate a lack of voluntariness including: physical confinement in the work location, an order to work backed up by a credible threat of a penalty for non-compliance, deception or false promises regarding types and terms of work, and withholding of wages.  *Bridgestone,* 492 F. Supp. 2d at 1013.[12]  Those facts exist here.  Indeed,

---

[12] The facts of *Bridgestone,* however, are distinct, and do not support Kingtom's claims that the work here was done voluntarily.  Plaintiffs' complaint alleged the underpayment of wages and the fear of losing their jobs, and the Court found that that those facts, without more, did not constitute forced labor sufficient to overcome a motion to dismiss. 492 F. Supp. 2d at 991. Notably, the *Bridgestone* Court even remarked that the plaintiffs in that case failed to allege any ILO indicators of forced labor applied to the workers at issue, implying that the analysis may have been different had they made such a showing.  *Id*. at 1013-14.

the Redetermination found the existence of deception, restriction of movement and excessive overtime as factors that suggested that workers were not working voluntarily.  Redetermination at 19.  In addition, Kingtom was abusive of vulnerable undocumented workers, knowing they were not able to leave.  *Id*. at 8-10.  Kingtom does not appear to challenge the facts in the Redetermination, merely arguing that, even if true, they do not satisfy the statutory requirements.  But, Kingtom views the relevant facts in a vacuum, and asserts that none of these factors prevent workers from leaving or voluntarily quitting their jobs.  *See, e.g.*, Kingtom Comments at 14, 17, 18.  Forced labor, however, is nuanced and complex and the record evidence must be considered collectively to understand the circumstances at Kingtom.  As demonstrated below, Kingtom workers were unable to provide free and informed consent to work which was unconstrained by interference.

First, as stated above, Kingtom took advantage of the most vulnerable group of Kingtom workers, Haitians, who were not legally in the Dominican Republic, could not readily leave for fear of deportation, and were forced to obey Kingtom leadership.  Redetermination at 8-10; *see* supra at 28-29. As one worker put it "you have no documents nothing.  They'll give you a job.  But that lets them do whatever they want with you."  C.R. CBP 002033, P.R. CBP 002034; C.R. CBP 000222-226, P.R. CBP 000223-227.  There is no freedom of choice for this group of Haitian workers.  There was no option especially for this group to simply quit.  Kingtom Comments at 16.  They do not submit themselves voluntarily to these conditions.

Next, Kingtom deceived its workers (one of the ILO indicators (deception) that goes directly to voluntariness), failing to provide full information as to the conditions of employment that would allow a worker to provide free and informed consent.  Instead, Kingtom made promises to workers relating to payment of wages, the work to be performed, work conditions,

31

rules, fines, contracts, employment documentation, time off, vacation days, bonuses, and/or healthcare in order to entice them into working, and repeatedly failed to deliver on those promises. Redetermination at 11 and note 43; C.R. CBP 000258-264, P.R. CBP 000259-265. Kingtom assessed fines for various reasons which workers were not made aware of when starting their employment. C.R. CBP 000285, P.R. CBP 000286; C.R. CBP 000259-260, P.R. CBP 000260-261. Kingtom offered its workers bonuses or days off but failed to fulfill these promises. Redetermination at 12 and note 46. Healthcare expenses were deducted from the workers' wages, but healthcare was not provided. P.R. CBP 000261, P.R. CBP 000262. Workers were promised salary or pay raises, but those were not provided. C.R. CBP 0001024; P.R. CBP 0001025; C.R. CBP 0001034-1035; P.R. CBP 0001035-1036. And, although promised leave based on company policy, workers were not allowed to take the leave. C.R. CBP 000259, P.R. CBP 000260. The Kingtom workers did not consent to this work; indeed, the conditions of work were not voluntary.

Third, Kingtom restricted the workers' ability to leave the factory as a way to compel work (another of the ILO indicators (Restriction of Movement)). C.R. CBP 000273-277, P.R. CBP 000274-278. Kingtom apparently does not deny that it restricted workers' movement but instead argues that "none of these alleged actions restricted the movement of workers such that they could not voluntarily quit their job." Kingtom Comments at 18. If the criteria for voluntariness were simply that a worker can physically walk out the door, Congress would have defined the term in that way. That argument fails to appreciate the element of "psychological compulsion, *i.e.*, an order to work backed up by a credible threat of a penalty for non-compliance," or the environment of fear intentionally created by Kingtom. *See Bridgestone,* 492 F. Supp. 2d at 1013. The record demonstrates that workers were threatened and abused if they

32

did not work.  During the COVID-19 pandemic Kingtom required workers [[ ████████████ ████████████████████████ ]] without being allowed to go home.

Redetermination at 12-13 and note 48; C.R. CBP 000274, P.R. CBP 000275.  This went on between two-and-a-half to seven-and-a-half months, and by one report, for almost a year-and-a-half.  *Id*.; C.R. CBP 000224, P.R. CBP 000225.

Kingtom imposed additional restrictions such that workers were also prohibited from leaving work posts, going out to lunch, or going to the bathroom.  Redetermination at 13; C.R. CBP 000272-277, P.R. CBP 000273-278.  There were armed guards stationed at the exits of the Kingtom facilities and workers were not allowed to leave until their shifts were complete.  C.R. CBP 000273, P.R. CBP 000274; C.R. CBP 000919-920, P.R. CBP 000920-921.  One worker stated that you cannot leave.  "[I]f the boss said don't open the door to anyone you can't leave, you can't open the door."  C.R. CBP 002044; P.R., CBP 002045.  Another stated, it "[i]s as if you are a slave."  C.R. CBP 001814, P.R. CBP 001815; C.R. CBP 001813.  While Kingtom argues that the workers were "not absolutely restricted," Kingtom Comments at 18, this does not diminish the fact that the workers' movements were highly restricted and that Kingtom prevented the workers from leaving the factory to forcibly require workers to labor long mandatory work hours.  These restrictions contributed to an environment of fear from which workers felt compelled to work.

Fourth, and further evidencing workers' lack of consent, Kingtom would withhold wages, C.R. CBP 000285-289, P.R. CBP 000286-290, by imposing fines and penalties for "anything," without explaining these rules when employment began. C.R. CBP 000285, P.R. CBP 000286. Fines were assessed for going to the bathroom without permission, sitting down, and forgetting to clock in and out.  Redetermination at 15-16; C.R. CBP 000259, P.R. CBP 000260; C.R. CBP

33

000285; C.R. CBP 001298; C.R. CBP 000388.  Similarly, there were often unexplained deductions to workers' pay and imposed significant monetary fines on workers for minor infractions as an excuse to withhold wages from workers' paychecks every pay period.  C.R. CBP 000285-289, P.R. CBP 000286-290.  Workers were fined for not coming to work seven days a week, twelve hours a day.  Redetermination at 15-16; C.R. CBP 000286, P.R. CBP 000287; C.R. CBP 001395-1396, P.R. CBP 001396-1397.  Haitians, in particular, were subject to these penalties, making their salaries less than the Dominican minimum wage.  Redetermination at 15-16; C.R. CBP 001377; C.R. CBP 000222, P.R. CBP 000223.

The case law cited by plaintiff does not establish, or even contribute, to its claim that its workers submitted themselves voluntarily.  *Mohammed v. Sidecar*, 2016 WL 6647946 (N.D. Ill. Nov. 10, 2016) and *Arellano v. Marshalls of MA, Inc.*, 2018 WL 1120870 (N.D. Ind. Feb. 2, 2018) apply a criminal statute that has precise requirements for unpaid wages based on work performed in the United States.  The statute at issue in those cases has a vastly different purpose and applied different burdens from those at issue here.  In *Mohammed* a ride share driver in the U.S. was simply not paid the wages he was owed, and in *Arellano* there was certainly no compulsion to remain working, as one of the plaintiff's claims was constructive discharge based on a failure to provide wages.  *Arellano*, at *3.  To the contrary, the "gravamen" of the complaint here is not simply that workers were not paid what they were owed, but that based on the totality of the facts, the Kingtom workers did not submit themselves to that work voluntarily.

Finally, workers also were told that they must work overtime.  C.R. CBP 000266, P.R. CBP 000267.  They worked every day of the week, twelve hours a day, without any days off.  Redetermination at 18-19; C.R. CBP 000286, P.R. CBP 000287; C.R. CBP 000500, P.R. CBP 000501.  Not only were workers required to work mandatory overtime, they were also not paid

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

for overtime hours.  C.R. CBP 000286; P.R. CBP 000287.  Curiously, Kingtom questions whether overtime was voluntarily agreed to, or as stated above, the workers could simply quit their job.  Kingtom Comments at 14.  As one worker reported, [[ ███████████████ ██████████████████ ]] C.R. CBP 000346-347; C.R. CBP 000266 ██████████ ████████████████████████ ]]).  Another worker was told that the amount he received was [[ ████████████████████████████████████████ ████████████████ ]] C.R. CBP 000267.  Accounts by workers show that overtime is considered anything over eight hours, and that Kingtom would fine workers if they didn't work mandatory overtime.  C.R. CBP 000286; P.R. CBP 000287.  By all accounts, workers did not agree to a twelve-hour day and did not agree to being uncompensated for that work time.

The facts identified here, taken as a whole, describe work that is not voluntary.  Under Kingtom's logic, though, if a worker was told that he would receive pay, worked the required hours or more, and yet did not receive his pay, he would have still worked voluntarily because he initially went to work on his own accord.  This is not the correct standard.  Section 1307 does not prohibit goods made only with slave labor, nor does the statute require that workers are perpetually in a state of involuntary work; the statute delegates to CBP the ability to determine whether the goods were made involuntarily and with menace of penalty for nonperformance.  19 U.S.C. § 1307.  There is substantial evidence in the record to support that determination.

## IV.    The Redetermination Is Supported By Sufficient Evidence

As discussed at length above, the Redetermination is not arbitrary or capricious and is supported by substantial evidence.  Kingtom, however, contests the evidence in the record and contends it is stale, one-sided, and contradicted.  Kingtom Comments at 24-27.  Kingtom's challenge is unavailing.

First, this action deals with the agency's Finding in 2024 that Kingtom engaged in forced labor practices in violation of section 1307, and therefore, any facts supporting the agency's decision will logically precede that date and are not stale.  Moreover, it is well-settled that the Court's review is limited to the administrative record developed before the agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).  As such, the record here appropriately encompasses the sixteen worker interviews in 2022, photographic evidence and documentation DHS personnel collected, as well as information from a confidential informant employed by Kingtom at the time.  Redetermination at 6-8.  While Kingtom focuses on the interviews, the record includes additional information such as open-source information and trade data related to Kingtom's imports, open-source research on Kingtom and its labor practices including DRMOL inspection, media reports on Kingtom, and updates from U.S. Embassy officials in the Dominican Republic, some of which was dated after the 2022 interviews.  *Id*.  This evidence, in its totality, supports the determination that Kingtom was producing goods "wholly or in part" with forced labor.  19 U.S.C. § 1307

Nonetheless Kingtom attacks the interviews as being secretly conducted, not under oath, and uncorroborated.  Kingtom Comments at 24.  An investigation, with testimony under oath is not required, either pursuant to the statute or the regulation, nor would such an undertaking be possible when investigating allegations of forced labor abroad.  Under section 1307, once an allegation is received (in this case two allegations were received), CBP undertakes an investigation using the tools available to it in its law enforcement capacity.  That is exactly what happened here.  That Kingtom characterizes the investigation as secret ignores that the agency did precisely what it was supposed to do – investigate forced labor allegations.  The relevant evidence developed in the record supports the agency's conclusion.

Moreover, Kingtom suggests that the sixteen interviews of workers with firsthand knowledge of the conditions at Kingtom's facilities were somehow not credible. Kingtom Comments at 24. Plaintiff has no basis for this statement. And, this situation is different from the facts in *Consolidated Fibers, Inc.*, 535 F. Supp.2d 1345, 1356-57 (Ct. Int'l Trade 2008). In that case, an agency relied on unsworn statements of *one* individual. Here, there were multiple interviews, and other corroborating evidence. It bears noting that the *Consolidated Fibers* court found that other record evidence supported the individual statements and the agency's action was therefore not irrational. 535 F. Supp.2d at 1357.

Kingtom contends that no facts after the interviews show there is evidence of forced labor in its factory. Kingtom Comments at 25. According to record evidence, however, Kingtom's facilities closed due to labor issues in 2022, and for the second time in 2024, due to unsafe working conditions, excessive overtime and wage issues. Redetermination at 20-21; P.R. CBP 000218-221; P.R. CBP 004274-81; P.R. CBP 004282-94. The agency considered the reopening of Kingtom two weeks after its closure in 2022, and determined the time was insufficient to implement meaningful remediation which entail audits, systemic changes in policies and procedures, among other things. Redetermination at 20-21. Moreover, the closure of the Kingtom factory in 2024, and inspections by the Dominican Ministry of Labor in July of 2024, which resulted in infractions of the Occupational Health and Safety Violations and violations of the labor code, Redetermination at 21 (C.R. CBP 004273-4280, P.R. CBP 004274-4281), strongly suggested ongoing labor concerns at the Kingtom facility after the interviews in 2022.

If Kingtom so strongly believes that it is not committing forced labor violations, it is permitted to provide such information of remediation to the agency on its own accord. Kingtom never attempted to do that. Instead, Kingtom argues that the facts in the record do not support

37

the conclusion of forced labor. But the record as a whole supports CBP's finding. And, even if there is a possibility of "draw[ing] two inconsistent conclusions from the evidence [which there is not, it] does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Gartside*, 203 F.3d at 1312. Accordingly, there is ample evidence on the record to support the agency's conclusion of forced labor in Kingtom's factory, and the Redetermination should be affirmed.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain CBP's Redetermination.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ MONICA P. TRIANA
MONICA P. TRIANA
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
(212) 264-9237

Dated: May 1, 2026                          *Attorneys for Defendants*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KINGTOM ALUMINIO S.R.L., | |
| Plaintiff, | |
| v. | Court No. 24-00264 |
| UNITED STATES OF AMERICA;<br>DEPARTMENT OF HOMELAND<br>SECURITY;<br>U.S. CUSTOMS AND BORDER<br>PROTECTION;<br>KRISTI NOEM, Secretary,<br>U.S. Department of Homeland Security;<br>RODNEY SCOTT, Commissioner, U.S.<br>Customs and Border Protection, | PUBLIC VERSION |
| Defendants, | |
| and | |
| ALUMINUM EXTRUDERS COUNCIL;<br>UNITED STEEL, PAPER AND<br>FORESTRY, RUBBER,<br>MANUFACTURING, ENERGY, ALLIED<br>INDUSTRIAL AND SERVICE WORKERS<br>INTERNATIONAL UNION, | |
| Defendant-Intervenors. | |

CERTIFICATE OF COMPLIANCE PURSUANT TO USCIT
STANDARD CHAMBER PROCEDURE 2(B)

I, Monica P. Triana, trial counsel in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the foregoing brief, relying upon the Microsoft Word count feature of the word processing

program used to prepare the brief, certify that this brief complies with the type-volume limitation

39

under USCIT Standard Chamber Procedure 2(B) and contains 11,680 words.

/s/ Monica P. Triana